## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **DONNA BAKER-NOTTER,** ) | |
| 216 S. Patrick St. ) | |
| Alexandria, VA 22314 ) | |
| ) | |
| Plaintiff[1], ) | |
| ) | |
| v. ) | **Civil Action No. _____** |
| ) | |
| **FREEDOM FORUM, INC.** ) | |
| 555 Pennsylvania Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE,
## AND MONETARY RELIEF AND JURY DEMAND

## INTRODUCTION

1.  This is an action is brought by Plaintiff Ms. Donna Baker-Notter ("Plaintiff" or "Ms. Baker-
    Notter") for declaratory, injunctive, and monetary relief against her former employer,
    Defendant Freedom Form, Inc. ("Defendant", "Newseum" or "FF"), a non-profit
    organization that founded the Newseum in 1997.  Ms. Baker-Notter worked for Newseum for
    over 22 years before she was wrongfully terminated on January 31, 2017.

2.  Plaintiff seeks redress for harm that she suffered as a result of Defendant paying her less than
    one of her male comparators prior to December 2016, and ultimately unlawfully terminating
    her employment based on her advocating for disabled employees' and museum visitors'
    rights to reasonable accommodations; and based on sex discrimination and retaliation.

3.

---
[1] To avoid retaliation, Plaintiff has used the address of her counsel.

## JURISDICTION AND VENUE

4.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq*. ("Title VII") including, but not limited to the Lily Lilly Ledbetter Fair Pay Act of 2009; the Equal Pay Act of 1963, 29 U.S.C. § 206 *et seq*. ("EPA"), the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the District of Columbia Human Rights Act, DC Code § 2-1401.01 *et seq*. ("DCHRA").

5.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action raises allegations under federal laws.

6.  Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Complaint took place in Washington, D.C., where Newseum is located and where Ms. Baker-Notter worked.

7.  At all times relevant to this complaint, Defendant was Plaintiff's employer under the ADA, EPA, Title VII, and DCHRA.

8.  In consideration of the foregoing, personal jurisdiction and venue are proper in this Court.

## PARTIES

9.  At all times relevant to this complaint, Plaintiff Donna Baker-Notter, was employed at the Newseum. Ms. Baker-Notter began working for FF in 1989 as a Grants Assistant. Prior to being wrongfully terminated in January 2017, she held the title of Senior Director of Operations of the Newseum.

10. Defendant, Freedom Forum, is a nonprofit organization which runs the First Amendment Center, the Religious Freedom Center, and the Newseum Institute at Vanderbilt University in

Nashville, Tennessee. FF is the creator and parent organization to the Newseum located in Washington, D.C.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On or about April 27, 2017, Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") Washington Field Office ("WFO") regarding discrimination she faced at Newseum and filed a charge of discrimination. Her charge was filed within 180 days after one or more of the alleged unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 had occurred.

12. On or about July 30, 2018, Plaintiff received via USPS mail, a Notice of Right to Sue from the EEOC.  This notice gave Plaintiff ninety days from the receipt of the notice to file her Complaint related to her Title VII claims, which is on or before October 29, 2018.

13. Ms. Baker-Notter has exhausted all administrative remedies required to bring the instant complaint.

## FACTS

**Ms. Baker-Notter's Exemplary Performance**

14.  Ms. Baker-Notter's employment with FF commenced when she accepted an entry-level Grants Assistant position in 1989. After mastering her role in that department, she was promoted several times, ultimately landing at the Newseum as the Operations Coordinator in 1995.  Shortly thereafter she was promoted to a management position, Visitor Service ("VS") Manager.

15. In 1998, she was promoted to Senior Operations Manager.

16. She left FF in 2001 to pursue another career opportunity when the Newseum 1 was closing due to having purchased land in DC where Newseum 2 would be built.  Given the cost, the

company was unable to keep the Arlington-based Newseum open and offered a buyout for those interested.

17. In 2006, because of her proven track record and accomplishments, FF recruited Ms. Baker-Notter to return and accept the role of Director of Operations at the Newseum.

18. When discussing her return, Mr. Thompson stated that he needed a Director of Operations. However, because he "wanted to **be fair to the other guys in the department** who had not left during the buyout" he would not start her out as the Director of Operations. (emph. added).

19. Ms. Baker-Notter returned to the Newseum in January 2007 as the Senior Manager/Staffing and Training with the understanding that she would be promoted to Director of Operations in the near future, as she had discussed with Mr. Thompson prior to agreeing to return to Newseum.

20. In October 2010, Ms. Baker-Notter was promoted to Director of Training and Volunteer Services.

21. The Operations department was made up of Training/Volunteer Services and ADA Compliance, Facilities, Visitor Services/Admissions, Security, Night Operations and the Newseum Annex.

22. In July 2015, Ms. Baker-Notter was promoted to Senior Director of Operations, although it was **a promotion in name only** given that she was hindered from assuming the supervisory roles of the position and was not paid a salary commensurate with the position, as described in greater detail below.

23. As Senior Director of Operations her responsibilities included, but were not limited to overseeing the daily operations of the Training and Volunteer Services departments, private

tours, public parking garage, housekeeping, shipping and receiving, management of 601 Pennsylvania Avenue, ADA Compliance for both the Newseum and Freedom Forum and management of the Operations Department's budget.  She also acted on behalf of the Senior Vice President of Operations in his absence.

**ADA Protected Activity**

24. Prior to her first departure from the Newseum in 2001, Ms. Baker-Notter created a document suggesting ways to make the Newseum ADA accessible.  She gave the report to her then-supervisor, Max Page.  However, when she returned to the Newseum in 2007, it was apparent that her suggestions had not been considered when building the new Newseum facility in Washington, D.C.

25. Once the Newseum's offices moved to the new facility in D.C., she reported that the pull on the front doors of the museum was too heavy for those with disabilities and that the automatic door opener on the new facility required individuals with disabilities to enter the exit door.

26. Mr. Thompson told her **it was fine and that adding another opener would be too costly**.

27. She pushed back and expressed her concern that the Newseum was not complying with the ADA and was told that the Newseum had used an architect who made sure the plans for the Newseum were compliant.

28. She expressed concern again to Mr. Thompson because the break room and a conference room on the 2nd floor (administrative side) of the building were not accessible given that it was only accessible by stairs.

29. Mr. Thompson **said they did not have anyone on staff who could not get into the space**.

30. The Newseum hired Darrell (last name unknown), an individual in a wheelchair, to be a visitor services representative. Darrell often had difficulty opening doors into the administrative areas.  This was compounded during the set-up for events in the facility when catering staff would nearly block hallways in the facility completely.  Many times, there was not enough room for a wheelchair to access the area.

31. Ms. Baker-Notter spoke with Tim Lacefield, Night Operations Manager, about the need for the walkways to remain clear at all times. She stressed that this needed to be done for fire code, as well as for employees using a wheelchair to be able to enter and exit the administrative/behind the scenes areas.  Mr. Lacefield did not resolve the matter.

32. Ms. Baker-Notter then went to her direct boss, Mr. Thompson with her concerns. He also said he would take care of it, but did not.

33. She conveyed the same information to Pam Galloway-Tabb (Vice President of General Services) and Richard Fulks (former Director of General Services) who were responsible for oversight of the event vendors.  There was little to no improvement.

34. She would regularly check the hallways utilized by the FF employee using a wheelchair and ask the catering staff (vendor) to make room for a wheelchair to get through. She included notes about this in her Senior Operations Representative ("SOR") report on April 26, 2008, noting, "Catering for the brunch overtook the hallway outside Admin space on two.  We barely had room to get into the offices from the facility.  Could not access doors that open directly onto the floor, the stairs or the small freight."

35. The weekend of July 24-25, 2010, a New York attorney named Janice Schacter came into the Newseum when Ms. Baker-Notter was serving as the SOR.  Ms. Schacter complained about the lack of assistance for people who were deaf or hard of hearing.  They chatted at the

information desk for quite a while and Ms. Baker-Notter promised her she would pass her concerns on to senior management. Ms. Baker-Notter sent an email to Mr. Thompson and Nicole Mandeville (CFO) about the matter.

36. Upon Ms. Baker-Notter's return to the office on July 28, 2010, there was an email from Ms. Schacter. Ms. Baker-Notter passed Ms. Schacter's concerns on to Mr. Thompson who brushed them off.

37. Ms. Baker-Notter wrote a responded to Ms. Schacter via an email dated July 25, 2010 and had the text approved by Mr. Thompson. Mr. Thompson commented that **no one was going to "bully" the Newseum to do things**.

38. In 2013, Ms. Baker-Notter took on an additional responsibility and was made the Newseum's ADA Compliance Officer as the company worked to develop a settlement agreement with the Department of Justice for ADA violations, and provided the required reporting as they worked to correct the ADA violations. She received no additional compensation for taking on the new role.

39. As the ADA Compliance Officer, Ms. Baker-Notter met with resistance from senior management (VP and Senior VP level) on many occasions when advocating on behalf of visitors and employees who had ADA issues.

40. She suffered retaliation as a result of reasonably opposing management's conduct that was in contravention of federal disability and EEO law.

41. Senior management was frustrated by both Ms. Baker-Notter's work in this regard and the cost of correcting the ADA violations. At one-point Sr, VP, Paul Sparrow told Ms. Baker-Notter, "**All of this ADA stuff is costing us too much money and we don't have the staff or the budget to do these things**."

42. A Visitor Services representative, Victoria, had dyslexia and told her supervisors that she was unable to work in the coat check.  Reading and coordinating the tags was not something she could do and feel confident in her accuracy.

43. Ms. Baker-Notter explained to Mr. Borowsky that it would be a reasonable accommodation not to have her work in coat check since she was able to meet all of the other job requirements. He indicated that he did not feel it was a reasonable accommodation because other representatives would start bringing in doctor's notes in an effort to avoid doing the parts of their job that they did not like doing.  However, he ultimately complied.

44. Victoria went on to have other health issues and requested a reasonable accommodation of using one of the scooter's that the Newseum provided for visitors.  Visitor Services management asked Ms. Baker-Notter if they could challenge Victoria's need for the scooter. Not working in coat check and using the scooter were things that Visitor Services management frowned upon and they often commented that they hoped she would leave soon since they could not just fire her.

45. Prior to becoming the ADA Compliance Officer, Ms. Baker-Notter had an employee "MG" who made a request for a reasonable accommodation in 2009. MG's doctor told her that sitting was not helping her condition and suggested she use a "standing desk."  Ms. Baker-Notter was responsible for furniture for the company and told MG that she would talk to her boss about next steps, but that it certainly sounded like a reasonable accommodation request.

46. Ms. Baker-Notter went to Mr. Thompson and told him about the request.  He told her that MG needed to talk to her supervisor and that she was to **"stay out of it."**  Ms. Baker-Notter called MG a week or so later to inquire as to whether or not she had been given the standing

desk – or some other accommodation - to help with her condition. She said that she had not. Layoffs occurred not too long after that and MG was let go.

47. When MG, a member of the staff for many years was let go, Ms. Baker-Notter immediately thought of MG's reasonable accommodation request.  After that, she was hesitant to address staff related ADA issues with Mr. Thompson or any other member of senior management. Given the ongoing dismissal by Mr. Thompson when Ms. Baker-Notter would express her concerns regarding the Newseum's failure to meet the requirements of the ADA, Ms. Baker-Notter believes MG's request for a reasonable accommodation played a role in her being laid off.

48. AR, another member of the Newseum staff, came to Ms. Baker-Notter in 2016 to ask if, as a salaried employee, she was required to take vacation or sick leave for doctor's appointments. Ms. Baker-Notter told AR that it was her understanding that as a salaried employee, she should not have to use her leave.  She then went on to tell Ms. Baker-Notter that her supervisor was insisting that she use leave for her doctor's appointments.  Ms. Baker-Notter suggested that she speak with HR about the issue.  AR was let go in the same round of layoffs that Ms. Baker-Notter was.

49. The Newseum has a strict "no outside food" policy.  As the ADA Compliance Officer, Ms. Baker-Notter received a call from the mother of a child who was coming to the Newseum on a field trip. She stated that her son was in a wheelchair, was only able to eat pureed food and that she would be accompanying him on the field trip.  The mother stated that the school informed her that she was not allowed to bring her son's food on the field trip - that he had to eat the food in the Newseum's Food Section along with the other students.   The mother had spoken with the field trip coordinator in the Newseum's education department who informed

her that per Newseum's Vice President of General Services, Ms. Galloway-Tabb, no one was allowed to bring food into the facility.

50. The mother told Ms. Baker-Notter that she was very upset, had Multiple Sclerosis and the stress was causing a flare-up of her condition.  After speaking with the Newseum's field trip coordinator, Ms. Baker-Notter apologized to the mother on behalf of the Newseum and told her that she would meet with all the staff involved in the scenario and inform them that she or her son could bring his lunch in.

51. Ms. Baker-Notter then updated the field trip coordinator and called Ms. Galloway-Tabb.  She explained that the class was going to be eating lunch in the Food Section and that due to the student's medical condition and puree requirement this student was allowed to bring his own lunch.  Ms. Galloway-Tabb became agitated and gruffly told her that "her kitchen staff could have cut up his food."

52. Ms. Baker-Notter explained that it was not just "cutting up the food" and that the young man might have food allergies and it was best to let him bring his own lunch.  Ultimately, Ms. Galloway-Tabb acquiesced although she expressed her concern about people bringing in food and claiming they had a medical condition, so that they could get away with it.

53. In the DOJ audit, the Newseum was cited for not having wheelchair or companion seating in its theaters.  After one of the walkthroughs with the DOJ representatives, Ms. Baker-Notter asked Mr. Thompson why, since they had used an architect who knew the ADA regulations, they did not have companion seating in the Annenberg theater - the Newseum's largest theater.  He told her that **they were "economically engineered out when budgets started running tight**."

54. Ms. Baker-Notter asked him what other changes were made to the original design of the Newseum due to finances.  He said, "**Obviously, most of the ADA stuff was cut**."

55. At a later time, he told her that the Newseum wanted to go after the architects to recover the money for the fine and improvements the DOJ was requiring due to the facility not meeting ADA requirements.  She asked him how they could hold the architects responsible when a conscious decision had been made by Newseum management to alter the architect's plans.

56. Mr. Thompson responded, "You are right, but it doesn't matter anyway because too much time has gone by for us to go back to them," as any warranties associated with the Newseum's construction had expired.

57. As the Newseum's ADA Compliance Officer, Ms. Baker-Notter was put in a position of ongoing internal conflict.  For example, in 2014 there were several departments (Visitor Services, General Services and the Production/Tech team) who required ongoing communication with their staff to ensure the trash cans that were being placed in wheelchair/companion seating spots were removed.  The areas were being used, not only for trash can placement, but also for bar set-up and camera locations.

58. Later in 2014, Mr. Thompson told Ms. Baker-Notter to stop addressing the issue with the other departments because it was a "revenue issue that was seen as being more important by the higher ups than wheelchair seating."

59. Even though Ms. Baker-Notter was a participant in the exhibits planning meeting, the exhibits team would often wait until they had developed a full exhibit and created a mock-up before asking her to review the plans.  However, when she would point out an area that was not compliant or was missing (tactile exhibit for example), they would begin challenging her and saying, "**we don't have time to go back and fix that now**" or "**we don't have the**

**money to change that**."  Opposition toward the ADA was the norm with senior

management.

60. Ms. Baker-Notter disclosed her disability to Cindy Keith, the Director of HR Benefits, for the

Freedom Forum/Newseum (approximately October - December 2016).  Her medical

condition had gotten worse in mid-2016 and she had to adjust her medication.  After trying

several different medications, **FF's insurance provider was refusing to cover the**

**medication that worked for her due to it being more expensive than others that had not**

**worked for her**.

61. Ms. Baker-Notter spoke with Ms. Keith about the situation and how best to get it resolved.

Management was aware that she had been approved for and had taken short term disability

("STD") for six weeks in November 2011 following her surgery.

62. At one point, Ms. Baker-Notter was ready to walk away from her ADA duties. She told Mr.

Thompson that unless senior management, including him, supported the Newseum meeting

the ADA regulations, there was no point in her being the Newseum's ADA Compliance

Officer.

63. Scott Williams became the COO in October 2012 while Ms. Baker-Notter was at the

Newseum.  Mr. Thompson set up a meeting with Mr. Williams, himself, and Ms. Baker-

Notter, so the three of them could discuss her concerns.

64. At the meeting, **Mr. Williams told her not to worry about where they were not meeting**

**the regulations, that they were not going to spend more money, and if someone had a**

**problem with that she should send them to him**.  After that pronouncement, Mr. Williams

abruptly ended the meeting.

65. After the meeting, she told Mr. Thompson that she no longer wanted to be the Newseum's ADA Compliance Officer since her reputation was on the line. **Mr. Thompson told her to "settle down."**

66. Ms. Baker-Notter believes that FF was motivated to select employees with medical conditions for the fourth round of layoffs given FF's financial challenges and interest in cutting overall health insurance costs.

**Newseum's Sex Discrimination**

Misogyny

67. When Newseum recruited Ms. Baker-Notter to return in 2006 and she accepted Newseum's offer of employment in January 2007 at the Washington, D.C. location, she became aware of the "good old boy" culture in the Operations department. On a daily basis she faced misogynistic slights and other discriminatory behavior from both Mr. Thompson and two of the other male directors, Matt Borowsky and Cory Leckey.

68. She was often left out when Mr. Thompson went to lunch and had drinks both in and out of the office with her comparators, the other male directors, Matt Borowsky, Nate Tucker, and Cory Leckey.

69. As the only female director in the Operations department, Ms. Baker-Notter was treated substantially different than her male comparators; for example, Mr. Thompson frequently requested that she answer phones and make copies when his secretary was out of the office, as though Ms. Baker-Notter was his personal secretary. He did not ask her male comparators to perform these secretarial tasks.

70. He often treated Ms. Baker-Notter as his secretary requesting that she perform clerical work, which he never asked her male comparators to perform.

71. She found Mr. Thompson's many requests misogynistic, embarrassing and belittling.

72. Overall, Mr. Thompson's behavior toward Ms. Baker-Notter undermined her authority with her male comparators.

73. When Ms. Baker-Notter was the Senior Manager/Staffing and Training, Mr. Borowsky created a toxic work environment for her by complaining about the fact that she was involved in "his hiring process".  He also complained to others due to Mr. Thompson assigning Ms. Baker-Notter the task of assigning VS staff position locations for all large events being held at the Newseum prior to the grand opening. She was met with challenges every step of the way in performing her role of filling vacancies in the Visitor Services sub-department.

74. Ms. Baker-Notter brought her concerns to Mr. Thompson's attention several times following her return to Newseum and also after the Newseum opened in April 2008.   He responded, "Matt is intimidated by you. You created an excellent Visitor Services program for Newseum 1 and he feels like he has to surpass that."

75. For the next several years, she would continue to bring her concerns to Mr. Thompson's attention, specifically how Mr. Borowsky interacted with her and complained about the fact that she was involved in "his hiring process". Each time she went to Mr. Thompson, he told her in a misogynistic way, "**Be nice**."

76. She finally asked Mr. Thompson if he had instructed Mr. Borowsky to be nice to her. Mr. Thompson stated that **he had not and that he had no plans to do so in the future**.

77. She assumed this was due to Mr. Thompson's friendship with Mr. Borowsky and their going to lunch almost daily. Mr. Thompson treated her as though she were the person causing problems at work, yet Mr. Borowsky's behavior was overlooked and left unchecked because he was the favored male.

14

78. Ms. Baker-Notter's staff witnessed how Mr. Thompson treated her in contrast to how he treated her male comparators and regularly vocalized their concerns stating, "**Mr. Thompson would never ask Matt to do that**," or "**Guess you aren't one of the guys**."

<u>Unequal Work Distribution</u>

79. To lure Ms. Baker-Notter back to FF in 2007, Mr. Thompson, told her that she would be promoted to Director of Operations and the money could be made up then.  He told Ms. Baker-Notter that he was going to name her his successor when he retired.

80. Charles Overby (former President/CEO) apologized for FF not matching Ms. Baker-Notter's salary at her then-current employer and agreed to reinstate her vacation and credit her for all the years she worked for FF.  Ms. Baker-Notter accepted his offer of employment because she believed Mr. Thompson when he said he would promote her to Director of Operations.

81. Mr. Thompson reneged on that promise and instead promoted four people to directors in the Operations department – three men and Ms. Baker-Notter.  Ms. Baker-Notter believes that she would have received the pay commensurate with her experience and average salaries for people in her position had Mr. Thompson only created the Director of Operations position, as he said he would.

82. From her return to the Newseum in 2007 until her unlawful termination on January 31, 2017, Mr. Thompson exploited Ms. Baker-Notter by dangling promotions over her head to get her to take on additional work.  The next promotion he told her she would get was always tied to her taking on more and more responsibility.

83. She trusted his word and agreed to take on the additional responsibilities with the hope of becoming the Director of Operations, as they had discussed in 2007.

84. Ms. Baker-Notter continually took on more work without receiving any additional compensation.  Ms. Baker-Notter began to see a pattern.  Mr. Thompson's talk of promotions always changed even though she took on additional responsibilities based upon his implications of future advancement.

85. In April 2008, the new Washington, D.C. Newseum location opened and as a result, Ms. Baker-Notter's responsibilities were substantially increased, but without any salary increase.

86. Among her other job responsibilities, Ms. Baker-Notter took on the Manager of Training's workload after the Manager of Training was laid off for performance reasons.

87. In November 2008, the Facilities team dissolved, and employees were sent to other departments. Anna Frueh and Ryan Davis were moved to Operations under Ms. Baker-Notter's management. Ms. Baker-Notter also assumed responsibility for Housekeeping, Shipping & Receiving, Facilities (furniture, keys, misc.) and management of the sublease at 601 Penn Avenue. Her responsibilities doubled, if not more than doubled, but she was not given any salary increase or bonus.

88. In March 2009, Mr. Thompson laid off the Volunteer Manager, which forced Ms. Baker-Notter to assume direct responsibility for the Volunteer Program. She was not compensated for taking on the additional responsibilities.

89. In contrast, her male comparators did not have to take on additional responsibilities nor did their job roles double or triple like Ms. Baker-Notter's job roles did.

90. Beginning in 2007, Ms. Baker-Notter's job responsibilities continued to increase.  She went from having staffing and training to staffing, training and volunteers.  Then to training, volunteers, housekeeping, shipping and receiving, facilities and 601 Penn Avenue.  ADA

Compliance Officer was added and then finally management of the operations budget and the creation and management of the parking garage in the building.

91. In contrast, Ms. Baker-Notter's male comparators did not have any increase in their work responsibilities since 2007.

92. On March 25, 2010, during Ms. Baker-Notter's performance review, she asked Mr. Thompson to look at the company's organizational chart in conjunction with her evaluation. This was not the first time she requested Mr. Thompson review the organizational chart taking into account the workload distribution.

93. In this performance review meeting, she requested that Mr. Thompson look at the organizational chart because she believed the work had not been fairly distributed.

94. Mr. Thompson told her, "**Life isn't fair. Some people have to work more than others**." By that, Ms. Baker-Notter took him to mean, women.  She was offended by the comment and responded that she had no problem with doing more work, but that she took issue with how others male directors socialized daily during work hours for extended periods of time at the Admissions Counter (Register 7), almost always took lunch, rarely worked late, and had support staff who managed those working under them whilst she could barely keep her head above water with the demanding workload.

95. Since the "boys club" members were allowed to socialize daily during work hours for extended periods of time at the Admissions Counter (Register 7), almost always took lunch, rarely worked late, and had support staff, they should have been required to take on additional tasks instead of the brunt of the work being piled on Ms. Baker-Notter, but they were not.

<u>Unequal Pay</u>

96. In November 2014, Mr. Thompson instructed Ms. Baker-Notter to gather a median salary survey for the directors and manager (Annex building in Laurel, MD) in the Operations department. He stated he wanted to know what type of salary discrepancies they were looking at in Operations, as compared to the area average.

97. At that time, Ms. Baker-Notter's responsibilities included Training, Volunteer Services, ADA Compliance Officer, Shipping and Receiving Supervisor, Housekeeping and Private Tours. After the median salary information review, Mr. Thompson and Ms. Baker-Notter discovered that she was being **grossly underpaid by more than $40,000.00**.

98. In January 2015, Ms. Baker-Notter raised the pay disparity issue once again and Mr. Thompson promised that he was going to try to get her more money.

99. In June 2015, Ms. Baker-Notter approached Mr. Thompson yet again outlining all her additional roles and responsibilities assigned without extra compensation.

100.   Mr. Thompson reluctantly promoted her to Senior Director of Operations with a $10,000.00 raise, which still left a $30,000.00 salary gap. **He stated that she was "lucky" to be getting even that.**  He refused to discuss the matter further.

101.   Shortly after that meeting, Ms. Baker-Notter reviewed the most recent IRS Form 990 posted by FF and discovered that the Facilities Director (her male comparator, Cory Leckey) was making almost $20,000.00 more than her even after her $10,000.00 raise.

102.   When she approached Mr. Thompson about the pay disparity, he stated, "**Cory has a hard job**," which was offensive to her given that Mr. Thompson had overloaded her with new roles since she returned to FF in 2007, whereas Mr. Leckey was not overloaded with work.

103.    Ms. Baker-Notter was still $30,000 away from what she should have been paid, whereas Mr. Leckey had a lesser title compared to her and he had fewer responsibilities, yet he was earning $20,000.00 more than her even after her $10,000.00 raise.

104.    Ms. Baker-Notter pointed out to Mr. Thompson that she was allegedly Mr. Leckey's new supervisor as the Senior Director/Operations and it did not seem equitable for her to be making significantly less money than a subordinate employee. Mr. Thompson refused to do anything to remedy the pay discrepancy.

105.    It became a pattern and practice for Mr. Thompson to pile other's work on Ms. Baker-Notter and not her male comparators without supplementing her pay or providing additional support staff to assist her.

106.    None of Ms. Baker-Notter's complaints of unequal pay and unequal treatment through the years were investigated to her knowledge.

Ms. Baker-Notter was Denied a Promotion

107.    During her performance review in March 2010, Mr. Thompson knew Ms. Baker-Notter had requested to be promoted to Director of Operations, the position he had recruited her for in 2006.  Mr. Thompson reneged on that promise and told her that he was no longer going to promote her to Director of Operations, but instead was going to promote her and the three male directors in the Operations department, Mr. Borowsky (Visitor Services/Admissions), Mr. Tucker (Security), and Mr. Leckey (Facilities) to the director level.

108.    Ms. Baker-Notter was shocked to hear that news because of the fact that they had not assumed any additional responsibilities and because of her first-hand knowledge of the inappropriate and unprofessional behaviors of one of her male comparators who was being

considered for promotion. Altogether, the male comparators' behavior included, but was not limited to having affairs with female employees and sexual harassment.

109.     In December 2011, during a Board dinner for Mr. Overby's departure, Mr. Thompson told Ms. Baker-Notter that there was no way he could or would recommend any of the other male directors to replace him upon his retirement. He informed Ms. Baker-Notter that he wanted her to become Vice President of Operations upon his retirement. That never happened.

110.     Instead, he promoted her male comparator, Nathaniel Tucker, to the Vice President of Operations Position after she was terminated.

<u>Misogynistic Comments & Failure to Address Ms. Baker-Notter's Verbal Abuse Complaints</u>

111.     Mr. Thompson said he gave Ms. Baker-Notter the Housekeeping responsibilities in 2011 because "**as a woman, she had a better eye**." (emph. added).

112.     When Cory Leckey (Facilities Director) joined the Operations department in 2011, he intensified an already toxic work environment. He was sarcastic and rude toward Ms. Baker-Notter.

113.     Mr. Leckey told employees and Ms. Baker-Notter's subordinates that she was "incompetent".

114.     Employees whose work stations were nearby expressed how Mr. Leckey's repeated negative comments about Ms. Baker-Notter made them uncomfortable. She brought these matters to Mr. Thompson's attention, noting the discomfort level of her team. The daily abuse wore on Ms. Baker-Notter, but Mr. Thompson refused to intervene to correct the situation and stop the abuse.

115.    Kathy Bennett, former Regional Manager for ABM (a subcontractor used for both

Housekeeping and Engineering) informed Ms. Baker-Notter that Mr. Leckey even told her

about how much he disliked Ms. Baker-Notter and called Ms. Baker-Notter "incompetent".

Mr. Leckey frequently bullied and picked on Ms. Baker-Notter.

116.    In that same conversation, Ms. Bennett shared her own concerns about Mr. Leckey's

bullying behavior. Again, Ms. Baker-Notter reported Mr. Leckey's behavior to Mr.

Thompson's attention, but he refused to do anything to stop the abuse.

117.    After Ms. Baker-Notter's promotion to Senior Director of Operations in July 2015, a

manager in VS approached her about an incident where Mr. Leckey was in the Building

Operations Center ("BOC") (room where several members of staff were present) yelling that

there was "**no way in hell he would ever work for a woman, especially Donna**." When she

brought this incident and Mr. Leckey's ongoing unprofessionalism to Mr. Thompson's

attention he told her, "**He has a right to say what he thinks**."

118.    Mr. Thompson did not correct Mr. Leckey's foul language or abusive comments that

many employees in the company overheard. This is just one example of the mentality of

those in the "boys club." They could say whatever they wanted to or about the lone female

director in the department and get away with not being disciplined.

119.    Mr. Thompson permitted the male directors to curse, goof off, and have face time with

him personally whenever they wanted. In contrast when Ms. Baker-Notter, the only female

director, politely raised her gender disparity related concerns, Mr. Thompson reprimanded

her and stated that she was **"over the top"** or **"being emotional"**. She did not have the same

access to Mr. Thompson and resorted to scheduling appointments to speak to Mr. Thompson

while the male directors had unlimited access to him.

120.    In July 2010, Mr. Leckey came into Ms. Baker-Notter's office and became verbally

abusive towards her. She told him, "We are going to meet with Jim Thompson and let him

resolve this once and for all."

121.    They met with Mr. Thompson who stated that the "problem" between the two of them

was that they were very much alike – they were both passionate about their team members.

Mr. Thompson went on to say that it was time for them to take things down a notch and try to

get along.

122.    Mr. Thompson did not take any action to resolve the matter or to reprimand Mr. Leckey

for his verbal abuse of Ms. Baker-Notter.

<u>Ms. Baker-Notter Deprived of Supervisory Functions Due to Her Gender</u>

123.    The Operations department was made up of Training/Volunteer Services and ADA

Compliance (Baker-Notter), Facilities (Leckey), Visitor Services/Admissions (Borowsky),

Security (Tucker), and Night Operations (Lacefield) and the Newseum Annex (Gibbs).

124.    In the fall of 2016, Ms. Baker-Notter's subordinate staff were moved under the Volunteer

Manager, Anna Frueh in anticipation of her management over the male directors after her

promotion to Senior Director of Operations. The movement of Ms. Baker-Notter's team to

Ms. Frueh could not have happened without Mr. Thompson's approval.

125.    However, when Ms. Baker-Notter was promoted to Senior Director of Operations in July

2015, and although her Senior Director of Operations job description contained a reference to

supervising other directors and she and Mr. Thompson had even discussed that she would be

supervising the other directors, **that never happened**.

126.    In explaining his rationale for "holding off" on allowing Ms. Baker-Notter to fulfill her

supervisory functions over the male directors, Mr. Thompson stated that, "**they would be**

**upset**" if they had to report to her. This was yet another example of Mr. Thompson's "boys club" mentality.

Ms. Baker-Notter Was Not Permitted to Promote or Hire Staff

127.     Ms. Baker-Notter was also not permitted to promote her staff or hire support staff, a common practice of Mr. Borowsky, her male comparator.

128.    Mr. Borowsky would have lunch with Mr. Thompson almost daily.

129.    In contrast, Mr. Borowsky was treated more favorably in that his management team continued to grow even as his team decreased in number, he was the only person in the Operations department with an assistant (aside from Mr. Thompson).  Ms. Baker-Notter did not have an assistant even after she became Senior Director of Operations.  In contrast, Mr. Borowsky, who had a lesser title, had managers/coordinators with only one subordinate.

**Retaliation**

130.    Ms. Baker-Notter worked for FF for 22 years and never had any performance issues or faced any disciplinary procedures. She also had an exemplary performance record, as described above, yet after 22 years of excellent performance, FF terminated her on January 31, 2017, after she continued to complain about the gender disparity that she faced.

131.    The timing of her termination was also only a few months after she went to Mr. Thompson to inquire about a reasonable accommodation request from one of her co-workers. Ms. Baker-Notter is not aware of any of the male directors in the Operations department who engaged in ADA related protected activity.

132.    To Ms. Baker-Notter's knowledge she was the only director who complained of FF's noncompliance with the ADA.

133.    Only Ms. Baker-Notter's group, Training/Volunteer Services and ADA Compliance, was

impacted by the layoffs in 2017. Her male comparators' groups in Operations were

unaffected.

**No Legitimate Business Interest in Terminating Ms. Baker-Notter's Employment**

134.    FF does not dispute that Ms. Baker-Notter was an exceptional employee.

135.    FF concedes that Ms. Baker-Notter was a highly-regarded employee who consistently

received excellent reviews, reflected in her frequent promotions. In fact, she received a letter

from her former boss, James Thompson, Jr. after FF terminated her which noted:

> "I have known Donna Baker-Notter for 21 years…It was truly my hope and belief that
> Donna would replace me as Senior Vice President of Operations when I retired…Donna
> is a natural leader with strong organizational skills and the ability to motivate people…If
> you are looking for a person who can develop policy, train your staff, build effective
> teams, manage the budget and oversee daily operations…you found her!"

136.    Ms. Baker-Notter was the only director in the Operations department who was terminated

in January 2017.  She is also the only director who complained of gender and pay disparity.

137.    As described above, at least one of the males, Mr. Leckey, was making more money than

Ms. Baker-Notter prior to December 31, 2016, although she was supposed to be his supervisor

with a higher-level position.  If FF had budget constraints, then it would have made sense for FF

to terminate Mr. Leckey's position, especially given that Ms. Baker-Notter was being paid less

and was performing more roles within the Operations department.

138.    That did not happen due to Mr. Thompson's gender bias.  He was not about to terminate

anyone in his "boys club." Only Ms. Baker-Notter, the sole female director in the Operations

department was let go.

139.    There was no legitimate business reason for FF to suddenly terminate Ms. Baker-Notter's

employment after she had been a loyal employee for 22 years.

140.    If budget were a concern, Mr. Borowsky could have been terminated, but he was not,

despite him being reported for sexually harassing female staff.

141.    Anytime something was said that might reflect negatively on Mr. Borowsky's work, Mr.

Thompson would defend him.  This was evident in his handling of the sexual harassment

complaint that was brought against Mr. Borowsky.  Even with at least three females in the

department, Ms. Baker-Notter was one of them, going to Mr. Thompson about the situation he

did not take the issue to HR.

142.    Ms. Baker-Notter could have done Mr. Borowsky's job, as she was the one who created

his department and was his superior in seniority and rank.  She was never given that opportunity.

Instead, she was the only director who was fired.

143.    But for Ms. Baker-Notter being a woman in a director position who had opposed FF's

unlawful and discriminatory practices as it pertained to disabled FF employees and visitors, she

would not have been paid less nor would she have been terminated, effectively ending her 22-

year career with FF.

**Damages**

144.    Ms. Baker-Notter is disappointed at how FF has handled these matters to date, especially

regarding the unlawful termination. She takes these matters seriously, given the harm that she

has suffered professionally, physically, economically, and emotionally, due to the discrimination

and retaliation she faced, which ultimately ended with her termination from FF and left her with

no salary or benefits to provide for her family.

145.    Ms. Baker-Notter would like to put this matter behind her and move on with her life, but

she is a changed woman. The work-related stress and humiliation of being the only director in

the operations department to be let go took a toll on Ms. Baker-Notter's physical health.

146.    The termination also had a tremendous impact on her emotional and psychological well-being. Ms. Baker-Notter now suffers from depression, insomnia and saw a therapist due to the work-related stress.

147.    She has suffered from severe tension in her neck due to the stress and has cracked teeth due to clenching her teeth from anxiety, which resulted in her seeking treatment from a chiropractor, massage therapist, and dentist.

148.    After Ms. Baker-Notter was terminated, she was left with no means to pay her mortgage, bills, or take care of her child. Ms. Baker-Notter's health insurance was also cancelled. Ms. Baker-Notter's damages continue to mount every day that she is unable to find comparable work despite her best efforts to secure employment.

## COUNT I: RETALIATION FOR OPPOSING DISCRIMINATION IN VIOLATION OF AMERICANS WITH DISABILITIES ACT OF 1990

149.    Plaintiff incorporates all the allegations contained in paragraphs 1-148, as if stated herein.

150.    Pursuant to the ADA, Defendant, as Plaintiff's employer, was obligated to provide reasonable accommodations at its facility for both Newseum visitors and staff.

151.    As described more fully in ¶¶24-29, 31-37, 39-41, 43-47, 51, 53-55, 57-59, 62-64, Plaintiff engaged in protected activity and Defendant failed to meet the ADA regulations.

152.    At all times during Plaintiff's employ, Defendant had actual knowledge of the ADA regulations requirements given Ms. Baker-Notter's persistent complaints to management, as described above.

153.    As described in ¶¶130-143, FF retaliated against Ms. Baker-Notter by terminating her employment.

154.    Plaintiff suffered retaliation and other damages, as described in ¶¶144-148.

155.    Defendant's retaliation against Plaintiff for her opposition to their ADA violations was

knowing, willful, and intentional, and was not in good faith.

156.    As a direct and proximate result of the acts and omissions of Defendant, as described

above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity,

emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other pecuniary and non-pecuniary losses.

## COUNT II: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

157.    Plaintiff incorporates all the allegations contained in paragraphs 1-156, as if stated herein.

158.    Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice

for an employer to discriminate against any individual with respect to the terms, conditions,

or privileges of employment because of an individual's sex.  42 U.S.C. § 2000e, *et seq.*

159.    Plaintiff was fully qualified to perform her director level positions and had performed

successfully in those roles at FF.

160.    Despite her qualifications, Defendant discriminated against Plaintiff in violation of Title

VII by subjecting her to different and adverse treatment on the basis of her sex. FF subjected

Plaintiff to discriminatory sex bias.  More specifically, Plaintiff was subjected to less

favorable terms and conditions of employment because of her sex, as described in ¶¶67-129,

in violation of Title VII.

161.    By reason of the continuous nature of Defendant's discriminatory conduct, which

persisted throughout the employment of Plaintiff from the time she returned to Newseum in

2007, she is entitled to application of the continuing violations doctrine to all violations

alleged herein. Additionally, Plaintiff specifically invokes the Lilly Ledbetter Fair Pay Act

provisions of Title VII.

162.    Defendant's policies, practices and/or procedures produced a disparate impact on
Plaintiff with respect to their wages and other terms and conditions of employment.

163.    Ms. Baker-Notter's male supervisor, Mr. Thompson, showed his discriminatory animus
when he refused to investigate or address the issues she continually complained about.

164.    FF treated Ms. Baker-Notter, the sole female director in the Operations department, less
favorably than it treated the male directors in the Operations department.

165.    Ms. Baker-Notter suffered an adverse employment action when FF intentionally ended
terminated her, as described in ¶82, 130, 136.

166.    Defendant's conduct was intentional, deliberate, malicious, and recklessly indifferent to
Plaintiff's statutory rights.

167.    Defendant's policies, practices and/or procedures have produced a disparate impact on
Plaintiff with respect to her wages and other terms and conditions of employment.

168.    As a direct and proximate result of the acts and omissions of Defendant, as described
above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity,
emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and
other pecuniary and non-pecuniary losses.

169.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for
violations of Title VII, including an award of punitive damages. Reasonable attorneys' fees
should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT III: SEX DISCRIMINATION IN VIOLATION OF THE DCHRA**

170.    Plaintiff incorporates all the allegations contained in paragraphs 1-169, as if stated herein.

171.  Under D.C. Human Rights Act, it is an unlawful employment practice for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of an individual's sex.  D.C. Code § 2-1402.11 *et seq.*

172.  Plaintiff was fully qualified to perform her director level positions and had performed successfully in those roles at FF.

173.  FF subjected Plaintiff to discriminatory gender bias.  More specifically, Plaintiff was subjected to different terms and conditions of employment because of her sex, as described in ¶¶67-129.

174.  Ms. Baker-Notter's male supervisor, Mr. Thompson, whom she confronted about gender disparity showed his discriminatory animus when he refused to investigate or address the gender disparity issues she complained about.

175.  Despite her qualifications, FF treated Ms. Baker-Notter, the sole female director in the Operations department, less favorably than it treated the male directors in the Operations department.

176.  Ms. Baker-Notter suffered an adverse employment action when FF intentionally ended terminated her, as described in ¶82, 130, 136.

177.  Defendant's conduct was intentional, malicious, and recklessly indifferent to Plaintiff's statutory rights.

178.  As a direct and proximate result of the acts and omissions of Defendant, as described above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

## COUNT IV: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

179.    Plaintiff incorporates all the allegations contained in paragraphs 1-178, as if stated herein.

180.    Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to retaliate against any individual by taking an adverse action because of the individual's opposition to any practice made illegal by Title VII.

181.    Plaintiff engaged in protected activity and FF was aware of her protected activity, as described in ¶¶74-75, 92-95, 98-100, 102, 104, 106, 114, 117, 119.

182.    FF subjected Plaintiff to retaliation for her engaging in protected activity, as described in ¶¶130-143.

183.    Plaintiff was fully qualified to perform her position as Senior Director of Operations.

184.    At the time FF terminated Plaintiff's employment FF management was aware that Plaintiff had complained about gender disparity in the workplace.

185.    FF's conduct, culminating in the decision to terminate Plaintiff, would likely dissuade a reasonable worker from raising sex disparity complaints against the company.

186.    FF's conduct of terminating Plaintiff by laying her off after complaining of gender disparity, was done in retaliation for Plaintiff's opposition to practices made illegal under Title VII.

187.    Defendant's conduct was intentional, malicious, and recklessly indifferent to Plaintiff's statutory rights.

188.    As a direct and proximate result of the acts and omissions of Defendant, as described above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and non-pecuniary losses.

189.   Plaintiff suffered retaliation and other damages, as described in ¶¶144-148.  By reason of

Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the

anti-retaliation provision of Title VII, including an award of punitive damages. Reasonable

attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT V: RETALIATION FOR OPPOSING SEX DISCRIMINATION IN VIOLATION OF THE DCHRA

190.   Plaintiff incorporates all the allegations contained in paragraphs 1- 189, as if stated

herein.

191.   Under the DCHRA, it is an unlawful employment practice for an employer to retaliate

against any individual by taking an adverse action because of the individual's opposition to

any practice made illegal by the DCHRA. DC Code § 2-1402.61 *et seq.*

192.   Plaintiff engaged in protected activity and FF was aware of her protected activity, as

described in ¶¶74-75, 92-95, 98-100, 102, 104, 106, 114, 117, 119.

193.   FF subjected Plaintiff to retaliation for her engaging in protected activity, as described in

¶¶130-143.

194.   Plaintiff was fully qualified to perform her position as Senior Director of Operations.

195.   At the time FF terminated Plaintiff's employment FF management was aware that

Plaintiff had complained about gender disparity in the workplace.

196.   FF's conduct, culminating in the decision to terminate Plaintiff, would likely dissuade a

reasonable worker from raising sex disparity complaints against the company.

197.   FF's conduct of terminating Plaintiff by laying her off after complaining of gender

disparity, was done in retaliation for Plaintiff's opposition to practices made illegal under

DCHRA.

198.    Defendant's conduct was intentional, malicious, and recklessly indifferent to Plaintiff's

statutory rights.

199.    As a direct and proximate result of the acts and omissions of Defendant, as described

above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity,

emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other pecuniary and non-pecuniary losses.

200.    Plaintiff suffered retaliation and other damages, as described in ¶¶144-148.

## COUNT VI: PAY DISCRIMINATION IN VIOLATION OF THE EPA

201. Plaintiff incorporates all the allegations contained in paragraphs 1-200, as if stated herein.

202.    Defendant has discriminated against Plaintiff in violation of the EPA by subjecting her to

unequal pay on the basis of sex, as described in ¶¶96-106.

203.    Defendant has discriminated against Plaintiff by treating her differently from and less

preferably than similarly-situated male employees who performed jobs which required equal

skill, effort, and responsibility, and which were performed under similar working conditions.

Defendant also discriminated by subjecting her to less pay and benefits in violation of the

EPA.

204.    As a direct and proximate result of Defendant's willful, knowing and intentional

discrimination, acts or omissions, as described herein, Plaintiff has suffered harm, including

but not limited to, lost wages, lost benefits, diminished future earning capacity, and other

pecuniary and non-pecuniary losses.

205.    Plaintiff should be awarded all legal and equitable remedies, including underpaid wages,

doubled compensatory or punitive damages for all willful violations and reasonable

attorneys' fees under 29 U.S.C. § 216, *et seq.*

206.    Plaintiff and similarly-situated female employees should be awarded the entire amount of
underpayment, interest, costs, reasonable attorneys' fees and other statutory penalties or
relief as may be allowed by the Court pursuant to the EPA.

## COUNT VII: PAY DISCRIMINATION IN VIOLATION OF THE DCHRA

207. Plaintiff incorporates all the allegations contained in paragraphs 1-206, as if stated herein.

208.    Under the DCHRA, employers are prohibited from discriminating in compensation on the
basis of sex. DC Code § 2-1401.01 *et seq.*

209.    Defendant has discriminated against Plaintiff in violation of the DCHRA by subjecting
her to unequal pay on the basis of sex, as described in ¶¶96-106.

210.    Defendant has discriminated against Plaintiff by subjecting her to less pay in violation of
the DCHRA.

211.    As a direct and proximate result of Defendant's willful, knowing and intentional
discrimination, acts or omissions, as described herein, Plaintiff has suffered harm, including
but not limited to, lost wages, lost benefits, diminished future earning capacity, and other
pecuniary and non-pecuniary losses.

212.    Plaintiff should be awarded the entire amount of underpayment, interest, costs,
reasonable attorneys' fees and other statutory penalties or relief as may be allowed by the
Court pursuant to DCHRA.

## COUNT VIII: RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

213.    Plaintiff incorporates all the allegations contained in paragraphs 1-212, as if stated herein.

214.    Plaintiff alleges that she suffered retaliation and harm because of her protected activity, in
violation of 29 U.S.C. § 215(a)(3).

215.    As a result of Defendant's willful retaliation, Plaintiff has suffered and continues to suffer

materially adverse harm, including but not limited to lost wages and benefits, diminished

employment opportunities, and humiliation, embarrassment, emotional and physical distress,

and mental anguish.

216.    By reason of Defendant's willful retaliation, Plaintiff is entitled to all remedies available

for violations of the anti-retaliation provision of the Equal Pay Act, as incorporated into the

Fair Labor Standards Act, including punitive and compensatory damages.

217.    As a direct and proximate result of the acts and omissions of Defendant, as described

above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity,

emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other pecuniary and non-pecuniary losses.

218.    Plaintiff suffered retaliation and other damages, as described in ¶¶144-148.

## COUNT IX: RETALIATION IN VIOLATION OF THE EQUAL PAY PROVISION OF THE DCHRA

219.    Plaintiff incorporates all the allegations contained in paragraphs 1-218, as if stated herein.

220.    Plaintiff alleges that she suffered retaliation and harm because of her protected activity, in

violation of DCHRA. D.C. Code § 2-1401.01 *et seq.*

221.    As a result of Defendant's willful retaliation, Plaintiff has suffered and continues to suffer

materially adverse harm, including but not limited to lost wages and benefits, diminished

employment opportunities, and humiliation, embarrassment, emotional and physical distress,

and mental anguish.

222.    By reason of Defendant's willful retaliation, Plaintiff is entitled to all remedies available

for violations of the anti-retaliation provision of the DCHRA, including punitive and

compensatory damages.

223.    As a direct and proximate result of the acts and omissions of Defendant, as described

above, Plaintiff suffered a loss in wages and benefits, diminished future earning capacity,

emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other pecuniary and non-pecuniary losses.

224.    Plaintiff suffered retaliation and other damages, as described in ¶¶144-148.

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Plaintiff prays this Court to:

a.   Enter judgment in her favor against Defendant;

b.   Declare that the conduct of Defendant is a willful violation of the Plaintiff's rights as

secured by the ADA, Title VII, EPA, and DCHRA;

c.   Award Ms. Baker-Notter punitive damages in an amount to be shown at trial;

d.   Award Ms. Baker-Notter full back pay including salary, benefits, entitlements, loss of

professional status and career-enhancing opportunities, bonuses, cash awards, loss of

retirement savings and benefits, and other remuneration and privileges of employment

retroactive to the date of any unlawful action found to have occurred in this case;

e.   Award Ms. Baker-Notter front pay;

f.   Award Ms. Baker-Notter pecuniary and out-of-pocket expenses;

g.   Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses incurred

by Ms. Baker-Notter as a result of Defendant's actions and inactions, as well as pre- and

post-judgment interest;

h.   Grant Ms. Baker-Notter such other and further relief as justice may require and are within

the equitable powers for this honorable Court.

## JURY DEMAND

Plaintiff seeks trial by jury on all matters and issues that can be so tried.


Dated: October 29, 2018                    Respectfully Submitted,

                                           **DONNA BAKER-NOTTER**
                                           By Counsel:


                                            /s/ Monique A. Miles_____
                                           Monique A. Miles, Esq.
                                           DC Bar No. 996026
                                           Old Towne Associates, P.C.
                                           216 South Patrick Street
                                           Alexandria, VA 22314-3528
                                           Phone: 703-519-6810
                                           mmiles@oldtowneassociates.com
                                           http://oldtowneassociates.com

                                           *Counsel for Plaintiff*