# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DONNA BAKER-NOTTER, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-2499 (RC) |
| | : | | |
| v. | : | Re Document No.: | 11 |
| | : | | |
| FREEDOM FORUM, INC., | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

## I. INTRODUCTION

Donna Baker-Notter is a former employee of Freedom Forum, Inc., a nonprofit

organization that operates the Newseum, a museum in Washington D.C. dedicated to journalism

and the First Amendment. Baker-Notter worked at the Newseum for most of the past three

decades, most recently as Senior Director of Operations. After her employment was terminated

in January 2017, she brought this action against the Defendant alleging nine counts of civil rights

violations. She alleges first that the Freedom Forum violated the Americans with Disabilities

Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, because she was fired as an act of retaliation in

response to her advocacy for ADA compliance at the Newseum. She likewise alleges that her

termination was an act of retaliation against her complaints about sex discrimination and equal

pay violations, and that it therefore violated Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e *et seq.*, the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2–

1401.01 *et seq.*, and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. §§ 206 *et seq.* She also

alleges pay discrimination in violation of the EPA and DCHRA, as well as sex discrimination in

violation of Title VII and the DCHRA.  Freedom Forum, Inc. has moved to dismiss all nine

counts of Baker-Notter's Amended Complaint.

## II.  FACTUAL BACKGROUND[1]

### A. Baker-Notter's Background and Employment at the Freedom Forum

Baker-Notter first worked for the Freedom Forum from 1989–2001, starting as a Grants

Assistant, and then, over the years, becoming an Operations Coordinator, Visitor Service

Manager and, eventually, Senior Operations Manager.  Am. Compl. ¶¶ 16–18.  She left the

Freedom Forum in 2001, but returned in 2007 as Senior Manager/Staffing and Training.  *Id.*

¶¶ 18–21.  Her supervisor, Jim Thompson, indicated to her "that she would be promoted to

Director of Operations in the near future," but that she could not be rehired into that position

directly because it would be unfair to other Operations Department employees who had never

left the Freedom Forum.  *Id.* ¶¶ 19–21.  After her return, she was promoted two more times, first

in October 2010 to Director of Training and Volunteer Services, and again in July 2015 to Senior

Director of Operations, though she alleges that this second promotion "was a promotion in name

only."  *Id.* ¶¶ 22, 24.  She never became Director of Operations.

According to the Amended Complaint, Baker-Notter consistently advocated for making

the Newseum more accessible to patrons and employees with disabilities and, accordingly, more

compliant with the ADA.  Prior to 2001, during her first period of employment with the Freedom

Forum, she drafted a document suggesting how the Newseum facility in Washington D.C.—

being planned at the time—could be made ADA compliant, but, upon her return in 2007, she

found her suggestions had not been considered.  *Id.* ¶ 26.  After she returned, she pointed out

---

[1] On a motion to dismiss for failure to state a claim, the Court accepts as true the factual
allegations in the complaint and construes them liberally in the Plaintiff's favor.  *See*, *e.g.*,
*United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

numerous accessibility issues to Thompson and other officials, including too-heavy doors, a conference room only accessible by stairs, and inadequate hallway clearances. *Id.* ¶¶ 27–39. Her concerns were consistently disregarded. *Id.* In 2013, Baker-Notter was made the Newseum's ADA Compliance Officer, as part of a settlement agreement with the Department of Justice.[2] *Id.* ¶ 40. Still she "met with resistance from senior management (VP and Senior VP level) on many occasions when advocating on behalf of visitors and employees who had ADA issues." *Id.* ¶ 41. On one occasion, she was told that that "[a]ll of this ADA stuff is costing us too much money and we don't have the staff or the budget to do these things." *Id.* ¶ 43. When she asked that accommodations be made for guests or employees with disabilities, these were denied and, on one occasion, she was told to "stay out of it." *Id.* ¶¶ 44–54. She was instructed to stop bringing up ADA compliance issues with other departments because, as Thompson explained, "it was a 'revenue issue that was seen as being more important by the higher ups than wheelchair seating.'" *Id.* ¶ 60.

Baker-Notter's Amended Complaint also details what she refers to as a "'good old boy' culture in the Operations department." *Id.* ¶ 69. Thompson would regularly go out to lunch or out for drinks with male directors including Matt Borowsky, Nate Tucker, and Cory Leckey, leaving out Baker-Notter, the only female director in the department. *Id.* ¶¶ 69–70, 72. Baker-Notter, on the other hand, was the only director who was asked to take on secretarial duties when Thompson's secretary was out of the office. *Id.* ¶¶ 72–73. Baker-Notter found these requests "misogynistic, embarrassing, and belittling," and felt that Thompson's attitude undermined her

---

[2] *See* Press Release, Department of Justice, Justice Department Reaches Settlement with Newseum to Improve Access for People with Disabilities (Dec. 6, 2013), https://www.ada.gov/newseum/newseum-sa.htm.

3

with the male directors.  *Id.* ¶¶ 74–75.  In 2011, he gave her "[h]ousekeeping responsibilities," saying that "as a woman, she had a better eye."  *Id.* ¶ 114.

The male directors in the Operations department also contributed to Baker-Notter's discomfort.  Borowsky "created a toxic work environment" by complaining about having to work with Baker-Notter.  *Id.* ¶ 76.  When she complained to Thompson about his behavior toward her, "he told her in a misogynistic way, 'be nice.'"  *Id.* ¶ 77–78.  He "treated her as though she were the person causing problems at work, yet Mr. Borowsky's behavior was overlooked."  *Id.* 80.  Leckey "was sarcastic and rude toward Ms. Baker-Notter," he "told employees and Ms. Baker-Notter's subordinates that she was 'incompetent,'" and, following her promotion in July 2015, was heard "yelling that there was 'no way in hell he would ever work for a woman, especially Donna.'"  *Id.* ¶¶ 115–20.  Thompson "refused to intervene," said that Leckey "ha[d] a right to say what he thinks," and reprimanded Baker-Notter for being "'overly aggressive,' 'over the top,' or 'emotional' whenever she complained."  *Id.* ¶¶ 117–122.

Baker-Notter never became Director of Operations, despite repeated promises.  *Id.* ¶¶ 110–12.  Instead of creating that position for her, Thompson promoted Baker-Notter and the three aforementioned men—Borowsky, Tucker, and Leckey—all to the level of director, with responsibilities divided.  *Id.* ¶ 84.  Although her job description eventually "contained a reference to supervising other directors," Baker-Notter never actually did this, and Thompson told her that the other (male) directors "'would be upset' if they had to report to her."  *Id.* ¶ 131.  Instead of getting this promised supervisory role, Baker-Notter was burdened with additional responsibilities that did not come with commensurate salary increases.  "Thompson exploited [her] by dangling promotions over her head to get her to take on additional work."  *Id.* ¶ 85.  When the Newseum in Washington D.C. opened in April 2008, for example, her responsibilities

increased substantially. *Id.* ¶ 88. She was given the Manager of Training's workload, was put in charge of the Volunteer Program, and, after a reorganization of the Facilities department, was also responsible for "Housekeeping, Shipping & Receiving, Facilities . . . and management of the sublease at 601 Penn Ave." *Id.* ¶¶ 89-91. The ADA Compliance Officer role was also added, in 2013. *Id.* ¶¶ 40, 93. The male directors were not required to take on additional roles. *Id.* ¶ 94. They "were allowed to socialize daily during work hours for extended periods of time . . . almost always took lunch, rarely worked late, and had support staff." *Id.* ¶ 98. When Baker-Notter raised the disparity in workload with Thompson, he told her, "Life isn't fair. Some people have to work more than others." *Id.* ¶ 97.

In November 2014, at Thompson's instruction, Baker-Notter compiled a "median salary survey for the directors and manager[s] in the Operations department." *Id.* ¶ 99. Given Baker-Notter's numerous responsibilities, the salary review revealed that "she was being grossly underpaid by more than $40,000.00." *Id.* ¶ 100. She raised this pay disparity with Thompson in January 2015,[3] at which time he agreed to promote her to Senior Director of Operations with a raise of $10,000. *Id.* ¶¶ 101–103. Thompson told her that she was "'lucky' to be getting even that," and Baker-Notter characterizes the elevation to Senior Director of Operations as "a promotion in name only." *Id.* ¶¶ 24, 103. Shortly after being promoted, in the summer of 2015, Baker-Notter discovered that Leckey was still making almost $20,000 more than her, even though she was overloaded with roles and he was not, and even though she was "allegedly" his

---

[3] It is unclear from the Amended Complaint whether they also discussed the disparity in November 2014. The Amended Complaint says that they "discovered" the disparity in November, and that Baker-Notter "raised the . . . issue once again" in January, but it does not explain exactly when it was first "raised." *See id.* ¶¶ 100–01.

supervisor. *Id.* ¶ 104–07.  She raised this issue with Thompson, who told her that, "Cory [Leckey] has a hard job." *Id.* ¶ 105.

In January 2017, Baker-Notter's employment with the Freedom Forum was terminated. *Id.* ¶ 135.  No other director from the Operations department was terminated at this time. *Id.* ¶ 140.  She was the only director who had complained about noncompliance with the ADA, about gender discrimination, or about pay disparities. *Id.* ¶¶ 136, 140.  She was also the only director who was a woman. *Id.* ¶ 142.  She had been an "exceptional employee." *Id.* ¶ 138.  The Amended Complaint suggests that the Freedom Forum explained that her termination was due to "financial challenges" or "budget constraints." *Id.* ¶¶ 68, 141.

## B. Procedural History

Baker-Notter filed a charge of discrimination on the basis of sex with the Equal Opportunity Commission ("EEOC") on July 31, 2017.  Ex. A. to Def.'s Mot. Dismiss, ECF No. 11-2; *see also* Am. Compl. ¶ 11.  She twice amended the EEOC charge, first in September 2017 to add allegations relating to equal pay, Am. Compl. ¶ 12, and again in June 2018 to add her ADA retaliation claims, *id.* ¶ 13; *see also* Ex. 1 to Errata, ECF No. 14-1.  The EEOC notified Baker-Notter of her right to file a lawsuit in July 2018.  Am. Compl. ¶ 14.  Her Complaint was filed in this Court on October 29, 2018.  Compl., ECF No. 1.  Freedom Forum moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim.  Def.'s Mot. Dismiss, ECF No. 5.  Baker-Notter sought leave to amend her complaint, Pl.'s Mot. for Leave to File First Am. Compl., ECF. No. 10, which this Court granted, Minute Order 3/26/2019.

Baker-Notter's Amended Complaint, the operative complaint for purposes of this order, was filed on March 26, 2019.  Am. Compl., ECF No. 12.  Freedom Forum has again moved to

dismiss for lack of subject matter jurisdiction and for failure to state a claim.  Mot. to Dismiss

Am. Compl., ECF No. 11  The motion is now ripe for decision.

## III.  ANALYSIS

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain

statement of the claim" in order to give the defendant fair notice of the claim and the grounds

upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

(per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate

likelihood of success on the merits, but rather tests whether a plaintiff has properly stated a claim

for which relief can be granted.  It is not necessary for the plaintiff to plead all elements of her

prima facie case in the complaint.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14

(2002); *Bryant v. Pepco*, 730 F.Supp.2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief

above the speculative level, on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted); *see also Harris v.*

*D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (requiring that a Title VII plaintiff

allege "facts that, taken as true, render his claim of retaliation [or discrimination] plausible").

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume

the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

"In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Schl.*, 117 F.3d 621, 624 (D.C. Cir. 1997). In employment discrimination cases, courts may, and often do, take judicial notice of EEOC charges and EEOC decisions. *E.g. Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018).

### A. Retaliation for ADA Protected Activity (Count I)

"Before bringing suit in federal court, ADA plaintiffs, like those suing under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (citing 42 U.S.C. § 12117(a) and *Park v. Howard Univ.*, 71 F.3d 904, 907–09 (D.C. Cir. 1995)); *see also* 42 U.S.C. § 12117(a) (incorporating sections of Title VII, including 42 U.S.C. § 2000e-5, which requires exhaustion of administrative remedies). The EEOC charge limits the scope of a later Complaint, because "a claimant may only challenge in federal district court those allegations that were contained in the EEO complaint or those that are 'like or reasonably related to the allegations of the charge.'" *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 75 (D.C. Cir. 2009) (quoting *Park*, 71 F.3d at 907 (quotations omitted) (Title VII case)). As under Title VII, the exhaustion requirement also "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *Park*, 71 F.3d at 907 (quotation and alteration omitted). "Although it is true that the administrative charge requirement should not be construed to place a heavy technical burden on individuals untrained

in negotiating procedural labyrinths, it is also true that the requirement of some specificity in a charge is not a mere technicality." *Id.* (citations and quotations omitted).

Here, Freedom Forum argues that Baker-Notter's ADA retaliation claim should be dismissed because it was not brought before the EEOC in a timely fashion. It styles this argument as a motion under Rule 12(b)(1) to dismiss for lack of subject-matter jurisdiction. However, "[a] motion to dismiss on the ground that a plaintiff failed to exhaust her administrative remedies is properly analyzed under Rule 12(b)(6)." *Jones v. Bush*, 160 F. Supp. 3d 325, 337 (D.D.C. 2016) (Title VII case), *aff'd*, No. 16-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017). The D.C. Circuit has said that "issues concerning how a claimant participates in [the EEOC] administrative process, both procedurally and substantively, are not of jurisdictional moment," when it comes to a claim under the Rehabilitation Act, *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015), and specifically that "administrative exhaustion requirements are not jurisdictional" in Title VII cases, *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017). Just recently, in a decision that came after Freedom Forum's motion was filed, the Supreme Court agreed that, for Title VII claims, the exhaustion of administrative remedies is not a jurisdictional requirement, but instead a mandatory claim-processing rule. *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019), and "[i]n recent years, the Court has undertaken to ward off profiligate use of the term ['jurisdiction']," *id.* (quotation omitted). The term "jurisdiction" is no more appropriate here, because Title I of the ADA incorporates procedures, including the exhaustion requirement, directly from Title VII. *See* 42 U.S.C. § 12117; *Marhsall*, 103 F.3d at 1098. The Court therefore construes this argument by the Freedom Forum as one under Rule 12(b)(6), for failure to state a claim.

If the ADA retaliation claim were never raised at all before the EEOC, dismissal on this ground would obviously be required. The complication here is that, although Baker-Notter did explicitly raise before the EEOC the theory of retaliation against her for advocating ADA compliance at the Newseum, she did not do so until she amended her charge in June of 2018, well after the 300-day period for filing a charge with the EEOC in the District of Columbia had expired.[4] Am. Compl. ¶ 13; *see also* Ex. A to Errata, ECF No. 14-1 (Amended EEOC charge). Baker-Notter's original charge made no mention of disability or ADA compliance, aside from a single sentence mentioning that, among several other listed responsibilities, Baker-Notter was the Newseum's ADA Compliance Officer. Ex. A. to Def.'s Mot. Dismiss ¶ 17, ECF No. 11-2 (Original EEOC Charge). In June 2018, she filed an amended charge statement which dedicated fifteen paragraphs, spanning nearly seven pages, to disability discrimination and retaliation claims. Ex. A to Errata, ECF No. 14-1. This was a significant addition, as Baker-Notter's original charge was only six pages in length.

Under the relevant regulations, EEOC complainants filing charges against private entities may amend their EEOC charges "to cure technical defects or omissions . . . or to clarify and amplify allegations made therein." 29 C.F.R. § 1601.12(b).[5] "Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to

_____

[4] Normally, 42 U.S.C. § 2000e-5(e)(1) provides for only a 180-day period for filing a charge with the EEOC. In the District of Columbia, the EEOC has reached a work-sharing agreement with the D.C. Office of Human Rights, which triggers an exception to this default rule and allows for filing within 300 days of the alleged discrimination. *See Griffin v. Acacia Life Ins. Co.*, 925 A.2d 565, 568–69 & n.13 (D.C. 2007).

[5] In their briefing, both parties mistakenly cite 29 C.F.R. § 1614.106(d), a regulation which only governs EEOC complaints made against the federal government. The standard governing amendment under that regulation is similar to the proper one. *Compare id.* (allowing amendment "to include issues or claims like or related to those raised in the [original] complaint"), *with* § 1601.12(b) (allowing amendments "related to or growing out of the subject matter of the original charge").

or growing out of the subject matter of the original charge will relate back to the date the charge was first received." *Id.* Baker-Notter argues, essentially, that because EEOC officials allowed her amendment, her ADA retaliation claims necessarily "related to or gr[ew] out of the subject matter of the original charge," and take the original charge's filing date. Pl.'s Opp'n To Def.'s Mot. Dismiss at 4, ECF No. 13. Freedom Forum, on the other hand, would have the Court reevaluate on its own whether the ADA retaliation claims are sufficiently related to those in the original EEOC charge to qualify for relation back. Def.'s Mot. Dismiss at 5–8, ECF No. 11-1. Freedom Forum has the better of the argument on this point because this Court, like others, has not ceded to EEOC investigators the power to interpret the federal code in such a binding fashion.

Courts frequently evaluate for themselves the relationships between discrimination claims and charges originally filed with the EEOC. More often this analysis is required when a Title VII or DCHRA suit has arguably added new theories of liability that were never presented to the EEOC at all. In those kinds of cases, where the EEOC never heard about the later-added claims, there is no question that the court must decide whether they are sufficiently related to the original ones. *E.g. Shipman v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 241 F. Supp. 3d 114, 123 (D.D.C. 2017) (dismissing claims because they concerned "additional discriminatory acts . . . not articulated in the administrative charge, . . . not reasonably related to the allegations in the charge, and . . . not fall[ing] within the scope of any administrative investigation that can be reasonably expected to follow"); *Ivey v. District of Columbia*, 949 A.2d 607, 615–16 (D.C. 2008) ("[I]t is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

Fewer cases have dealt with the circumstance before the Court today, where the EEOC allowed an amendment that, arguably, was not "related to or growing out of" the discrimination outlined in the original charge. One Court of Appeals has addressed a case like this, and concluded, as this Court does, that the EEOC's willingness to allow an amendment is not determinative because "permitting a late amendment . . . adding an entirely new theory of recovery would eviscerate the administrative charge filing requirement altogether by depriving the employer of adequate notice and resulting in a failure to investigate by the responsible agency." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) (quotations omitted)). Here, at least, investigation was not a problem, but adequate notice was. When claims are added to an EEOC charge after the expiration of the time for filing an EEOC charge, the potential defendant is not on notice of those claims within the appropriate amount of time and, thus, a crucial purpose of the administrative exhaustion requirement has gone unfulfilled. *See Park*, 71 F.3d at 907 ("The administrative charge requirement serves the important purpose[] of giving the charged party notice of the claim."); *see also Davis v. District of Columbia*, 925 F.3d 1240, 1245 (D.C. Cir. 2019) ("[T]wo plaintiffs' timely-filed [EEOC] charges put the [defendant] Agency on notice of the claims and vicariously satisfied the exhaustion requirement for the remaining [class] plaintiffs."); *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 367–68 (D.D.C. 2014) (finding, in a DCHRA case, that an administrative complaint did not toll the statute of limitations for claims against a defendant not mentioned in that complaint). Defendants will likely be surprised and unprepared by federal claims based on late-amended EEOC charges containing new claims and new theories of liability. The fact that EEOC officials were willing to expand the scope of their investigation at a late hour does nothing to mitigate the fact that the defendant employer knew nothing about this claim for over 300 days.

Having concluded that the EEOC's willingness to accept the amendment is not the end of the story, the Court must next consider whether Baker-Notter's ADA retaliation claims are sufficiently similar to her original EEOC charge. If they are, then the late amendment may relate to or grow out of the subject matter of the original charge, or, even if amendment was improper because of the late date, the original filing may be read as having put the defendant on notice of the later-added claim. This is a distinction without a real difference, as the same test applies under either framing. In the more typical circumstance of a federal claim that was never brought before the EEOC, courts apply a "'like or reasonably related' test," based on the language of the regulations, to compare the claims. *Craig*, 74 F. Supp. 3d at 362. The same test can be applied to determine whether late-added claims brought via amended EEOC charge letter are sufficiently related to those brought in an original timely filed EEOC charge. *See Evans*, 80 F.3d at 963 (applying the same test). Either way, the court is aiming at the same goal: "limit[ing] the permissible scope of the civil action to the scope of the EEOC investigation [that] can reasonably be expected to grow out of the charge of discrimination." *Craig*, 74 F. Supp. 3d at 367 (quoting *Ivey*, 949 A.3d at 615).

Baker-Notter's additional claims about disability retaliation do not "relate[] to or grow[] out of" her original claims and therefore do not fulfill the administrative exhaustion requirement. *Id.* at 367-68. The original EEOC charge, filed in July 2017, put Freedom Forum on notice that it would need to defend against sex discrimination claims, not claims focused on retaliation Baker-Notter faced because of her advocacy for ADA compliance. "[A] long line of cases prohibits plaintiffs from 'conflating ideologically distinct categories of discrimination for purposes of meeting their exhaustion requirements.'" *Bell v. Donley*, 724 F. Supp. 2d 1, 9 (D.D.C. 2010); *Casole v. Johanns*, 577 F. Supp. 2d 138, 141–42 (D.D.C. 2008) (holding that a

plaintiff who asserted only gender discrimination and retaliation in his administrative complaint had not exhausted administrative remedies with respect to a claim of discrimination based on national origin); *Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 64 (D.D.C. 1998) (reaching the same conclusion for a plaintiff who had asserted only sex discrimination in an administrative complaint). Even when a plaintiff reported an instance of discrimination to the EEOC and later claimed that a second, ideologically distinct, category of discrimination was at play in the very same incident, this Court did not credit the argument that the reporting of one type of discrimination fulfilled the exhaustion requirement for the second. *Bell*, 724 F. Supp. 2d at 9. ("Claims of 'ideologically distinct categories' of discrimination and retaliation . . . are not 'related' simply because they arise out of the same incident."). Here, Baker-Notter's additional disability-based claims arise from retaliation resulting from an entirely new set of protected activities, not presented in a timely fashion in the original EEOC charge.

In short, Baker-Notter's original EEOC charge did not focus on or even suggest that she might have retaliation claims based on her ADA compliance work. By the summer of 2018, when these new claims were added, it was too late to put Freedom Forum on notice, and the amended claims are too different to relate back to the filing date of the original EEOC charge. The EEOC investigators were willing to expand the scope of their investigation not withstanding the novel theories and the late hour, but this Court is not bound by their flexibility and instead must consider notice to defendants as well as the agency's ability to investigate. And such a lack of notice for more than 300 days may have real consequences such as the loss of evidence that would have been preserved if adequate notice had been timely given. Baker-Notter thus failed to exhaust her administrative remedies with regard to the ADA claim brought in Count I of the complaint, and Freedom Forum's motion to dismiss that Count is granted.

**B. Retaliation for Sex Discrimination and Pay Equality Activity (Counts IV, V, VIII, IX)**

Four of Baker-Notter's claims—Counts IV, V, VIII, and IX—allege that her termination was an act of retaliation against her for her complaints about sex discrimination and inequality of pay. These Counts are brought under Title VII, the DCHRA, and the EPA. To make out a case of unlawful retaliation under Title VII, a plaintiff must show: (1) that, by opposing a practice made unlawful by Title VII, she engaged in a statutorily protected activity; (2) that her employer took a materially adverse action against her; and (3) that there is a causal relationship between the protected activity and the adverse action. *Harris v. D.C. Water and Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). The elements of a retaliation claim under the DCHRA and the EPA are the same. *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 281 n.4 (D.D.C. 2015); *Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48, 51 & n.1, 53 n.4 (D.D.C. 2007).

Freedom Forum's argument for dismissal of all three claims focuses on the causation element. This element of a retaliation claim may be established either by direct evidence or by inference. *Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 255 (D.D.C. 2018); *see also Harris*, 791 F.3d at 70. The initial burden for a plaintiff facing a motion to dismiss is therefore not incredibly high, as "the plaintiff need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001). Nonetheless, Freedom Forum says that Baker-Notter has not cleared this low bar because she has suggested neither a direct connection nor enough facts to infer a motive. Baker-Notter's Opposition does not develop much by way of counterargument, instead stating in fairly conclusory fashion that a causal relationship does, in fact, exist. Pl.'s Opp'n to Def.'s Mot. Dismiss at 7., ECF No. 13

Freedom Forum is correct that Baker-Notter's amended complaint contains no facts suggesting that direct evidence of retaliation will be forthcoming as the case progresses. In her

complaint, and in her briefing on this motion, Baker-Notter merely states that, for example, "[Freedom Forum] subjected [her] to retaliation for her engaging in protected activity," Am. Compl. ¶¶ 186, 197, or, in opposing the motion to dismiss, that, "there is a causal relationship between the protected activity and the adverse employment action," Pl. Opp'n to Def.'s Mot. Dismiss at 7. It is well-established that this kind of "formulaic recitation of a cause of action's elements will not do" when it comes to defending against a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As a result, even though the Court "assume[s] the truth of all of plaintiffs' plausibly pleaded allegations, and draw all reasonable inferences in their favor" at this stage, *Agnew v. Gov't of D.C.*, 920 F.3d 49, 53 (D.C. Cir. 2019), the court is unable to read the complaint so generously as to assume Baker-Notter's proffered legal conclusion that a direct causal relationship has been pled. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

In the absence of an alleged direct connection between Baker-Notter's protected complaints about sex and pay discrimination and her firing, the Court is left to look at what it can infer. Baker-Notter does not say what circumstantial evidence the Court can expect to see or what inferential connections the Court ought to draw. Her briefing on the question simply restates the law and asserts that a causal relationship does in fact exist. Pl.'s Opp'n to Def.'s Mot. Dismiss at 6–7. One possibility, frequently argued by plaintiffs in retaliation cases, is that the Court ought to infer a causal connection based on circumstantial evidence concerning the timing of the protected activity and the adverse employment action. *See Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) ("[A] close temporal relationship may alone establish the required causal connection."); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir.

1985).  The only materially adverse action that Baker-Notter identifies as the basis for her retaliation claim is her termination in January 2017.  The latest-in-time protected action involving sex and pay discrimination[6] that the Amended Complaint plausibly alleges is a series of conversations between Baker-Notter and Thompson in June and July of 2015, around the time that Baker-Notter was promoted to Senior Director of Operations and was given a $10,000 raise.  *See* Am. Compl. ¶¶ 99–106.  If the Court assumes, for purposes of this motion, that these conversations were protected activity, that means that the adverse action came approximately eighteen months after the protected activity.

Eighteen months is too much time to infer causation based solely on temporal proximity in the absence of further evidence connecting the protected activity to the adverse action.  The Supreme Court has said that when timing is the only circumstantial evidence presented for a causal connection, "the temporal proximity must be 'very close.'"  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  Although there is no "bright-line . . . rule," *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012), cases in this Circuit have consistently rejected gaps of well under a year as insufficiently close to give rise to an inference of causation.  *E.g. Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013) ("[T]his Circuit has generally found that a two- or three-month-gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation.");  *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 88 (D.D.C. 2009) ("The case law supports the conclusion that, as a matter of law, a six-month delay by itself is insufficient to demonstrate the

---

[6] The Amended Complaint also says that the termination came "only a few months after [Baker-Notter] went to Mr. Thompson to inquire about a reasonable accommodation request from one of her co-workers" but, assuming this was a protected activity, it would be relevant only for the ADA retaliation claim in Count I and would have no bearing on Counts IV, V, VIII, or IX which are focused on sex discrimination and equal pay violations.

close temporal proximity necessary to infer a retaliatory motivation."); *see also Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting a period of "two and one-half months" and citing with approval cases from other Circuits rejecting periods of only two months). To find an implied causal connection for Baker-Notter would require disregarding the weight of this precedent, and then going further still to view the January 2017 termination of Baker-Notter as plausibly motivated by her protected activity some eighteen months prior. Absent further evidence, the Court cannot bridge this gap.

Without an obvious causal connection or some explanation of where one ought to be inferred, the Court is unable to say that the Amended Complaint contains a plausible allegation that Baker-Notter was fired because of her protected activity concerning sex discrimination and pay inequality. Freedom Forum's motion is therefore granted as to Counts IV, V, VIII, and IX, and these claims are dismissed.

### C. Pay Inequality (Counts VI, VII)

The Equal Pay Act of 1963 makes it illegal for an employer to "discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The statute makes some exceptions, which defendants may argue as affirmative defenses, but these do not come into play at the motion to dismiss stage. *United States EEOC v. George Washington Univ.*, No. 17-cv-1978, 2019 WL 2028398, at *4 (D.D.C. May 8, 2019). The DCHRA's equal pay provisions are comparable. *See Hawley v. Blackboard, Inc.*, No. 03-cv-656, 2005 WL 513496, at *8 n.1 (D.D.C. Mar. 3, 2005) ("Claims of unequal pay under the DCHRA are governed by the standards

of the Equal Pay Act."); *George Washington Univ. v. Violand*, 940 A.2d 965, 979 (D.C. 2008) (requiring proof of "equal work" requiring "equal skill, effort, and responsibility" under similar conditions for a DCHRA pay discrimination claim). Baker-Notter says that she received less pay and fewer benefits than "similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions." Am. Compl. ¶ 207.

Freedom Forum argues that Baker-Notter has not stated a claim for pay discrimination under either law because she "utterly fails to plead facts sufficient to show that the skills, effort and responsibilities required of her and her alleged male comparators were substantially equal." Def.'s Mot. Dismiss at 12. Freedom Forum cites a district court case in which a plaintiff provided "no record evidence of [comparator] female employees' titles, job duties, or qualifications," *Johnson v. District of Columbia*, 947 F. Supp. 2d 123, 132 (D.D.C. 2013), and an out-of-Circuit appellate opinion affirming a district court's ruling at trial on a motion for judgment as a matter of law and stating that a comparator had to be analyzed "factor by factor," *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 334 (4th Cir. 2004). In so arguing, Freedom Forum asks for too much. The pleading standard is not so high, and the level of detail pled by Baker-Notter is not so low as Freedom Forum suggests, and the case law it cites does not have mandatory precedential value in this Court. At the motion to dismiss stage, the plaintiff does not have to "show" anything, but only to allege, with some plausibility, enough facts to make her right to relief more than speculative. *See Twombly*, 550 U.S. at 555–56. She does not have to establish every element of the prima facie case in her pleading. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002).

The Amended Complaint consistently compares the treatment of Baker-Notter, who worked as Director of Training and Volunteer Services, and later as Senior Director of Operations, to the treatment of three male directors in the Operations department, Facilities Director Cory Leckey, Security Director Nate Tucker, and Visitor Services / Admissions Director Matt Borowsky.  Only Leckey's salary is discussed in detail, but in the context of the complaint there can be no mistaking that, when the Amended Complaint references "similarly situated male employees," it means to refer to these other directors who worked in the Operations Department.  Am. Compl. ¶ 207.  Their jobs were different, to be sure, but "jobs need not be identical in every respect before the Equal Pay Act is applicable; the phrase 'equal work' does not mean that the jobs must be identical, but merely that they must be 'substantially equal.'" *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 448–49 (D.C. Cir. 1976) (footnotes omitted).  The Amended Complaint explains that a "median salary survey for the directors and manager in the Operations department" demonstrated that Baker-Notter was being underpaid by a calculable amount—$40,000.  Am. Compl. ¶¶ 99–100.  This suggests that the jobs being surveyed were at least comparable, and it provides the Court with some idea of what evidence Baker-Notter will present.  Baker-Notter will have to show more than just comparability in order to prove that the male directors' jobs were "substantially similar" to hers, but comparability is a starting point and the fact that the salary comparison was compelling enough that Thompson gave Baker-Notter a partial raise also bolsters her case.  High-level managers working in discrete areas of organizations will necessarily have different responsibilities from one another, and courts should not require so much detail about similarity at the front end of a lawsuit as to make equal pay laws largely inapplicable to this class of employees.  If anything, Baker-Notter alleges that she did *more* and had *more* responsibilities than the other directors, but was paid less nonetheless.

On her equal pay claims, Baker-Notter has provided the Court with "a short and plain statement of the claim," and has given Freedom Forum fair notice of what she will be arguing. *See* Fed. R. Civ. P. 8(a)(2). Accepting her allegations as true and granting all reasonable inferences in her favor, the Court finds that she has alleged sufficient facts to make it plausible that she performed "substantially similar" work requiring the same skill, effort, and responsibility as the male directors. It will take much more detail to prove that all directors did in fact have "substantially similar" jobs, but Baker-Notter has said enough that the Court cannot dismiss her equal pay claims before giving her an opportunity to make this case. Freedom Forum's motion is therefore denied as to Counts VI and VII.

### D. Sex Discrimination (Counts II, III)

To prevail on an employment discrimination claim, a plaintiff must show that she suffered an adverse employment action because of her race, color, religion, sex, or national origin. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). DCHRA and Title VII discrimination claims are analyzed under the same legal standard. *Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 10 n.4 (D.D.C. 2008). It is undisputed that Baker-Notter, as a woman, was a member of a protected class, and that she suffered an adverse employment action in the form of her termination. The question before the Court on these Counts, then, is whether her Amended Complaint alleges facts making plausible a causal relationship between her sex and her firing—whether she has laid out a plausible case that she was fired *because* she was a woman. The Court holds that she has.

Baker-Notter's Amended Complaint describes what she calls a "'good old boy' culture in the Operations department," in which the male directors were treated with more respect and privilege by Thompson. Am. Compl. ¶¶ 69–81. Baker-Notter, by contrast, was tasked with

additional responsibilities that the male directors did not have to take on.  *Id.* ¶¶ 82–98.  These included both additional substantive workloads and menial secretarial duties for Thompson that male directors were never asked to handle.  *Id.* ¶¶ 72–73, 92–94.  Thompson criticized Baker-Notter for "being 'overly aggressive,' 'over the top,' or 'emotional'" when she complained about the male directors' treatment of her, *Id.* ¶ 122, and instructed Baker-Notter, but not to Borowsky, to "be nice" in order to resolve their mutual conflict, *Id.* ¶¶ 78–79.  One male director, Leckey, said there was "no way in hell he would ever work for a woman, especially Donna." *Id.* ¶ 120. There is no suggestion that Leckey was involved in the decision to terminate Baker-Notter, but the complaint establishes that Thompson took Leckey's feelings into account in his own decisionmaking: Baker-Notter's job description indicated that she ought to have been supervising other directors, but Thompson did not allow her because, he said, the male directors would be upset.  *Id.* ¶ 131.  Thus, even if Thompson himself harbored no bias against women or against Baker-Notter, the decision to terminate her may still have come about because she was a woman, if he was taking the male directors' views into account.  And there is no suggestion that anyone other than Thompson made the decision to pay Baker-Notter less than her male counterparts even though she was working harder and had more responsibilities.  In this context, where male directors with at least roughly comparable positions were treated so differently from Baker-Notter, and where at least some explicitly gender-based criticism had been leveled at her, it is perfectly plausible that Baker-Notter was treated worse, and eventually terminated, because she was a woman.

The Amended Complaint suggests that the Freedom Forum explained Baker-Notter's termination by reference to "financial challenges" or "budget constraints," *Id.* ¶¶ 68, 141, but this explanation is inconsistent with the rest of the facts pled in the Amended Complaint, which the

Court credits at this stage. Although financial challenges or budget constraints may explain why a reduction in force was necessary, they do not explain why Baker-Notter, the only director who was a woman, was chosen to be terminated over her male counterparts. According to Baker-Notter, she was doing more work for less pay in comparison to the male directors—at least in comparison to Leckey, who the Amended Complaint discusses in most detail. *See id.* ¶¶ 141. As the Amended Complaint explains, if the Freedom Forum were looking to downsize the operations department in the most efficient manner, why would it have made sense to fire Baker-Notter, whose salary was lowest even though her workload was largest? It is at least plausible that the answer is that she was fired at least in part because she was a woman, and so Freedom Forum's motion is denied as to Counts II and III.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 11) is **GRANTED IN PART AND DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 23, 2019                                     RUDOLPH CONTRERAS
                                                             United States District Judge

23