### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DONNA BAKER-NOTTER, | : | | |
| | : | | |
| *Plaintiff*, | : | Civil Action No.: | 18-2499 (RC) |
| | : | | |
| v. | : | Re Document No.: | 46 |
| | : | | |
| FREEDOM FORUM, INC. | : | | |
| | : | | |
| *Defendant*. | : | | |

### <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Donna Baker-Notter worked for Defendant Freedom Forum for over twenty years, rising through the ranks to the position of Senior Director of Operations, until she was terminated in 2017.  After her termination, she brought a range of employment discrimination claims against her former employer, which were streamlined somewhat by this Court's decision on Freedom Forum's motion to dismiss.  *See Baker-Notter v. Freedom Forum*, No. 18-cv-2499, 2019 WL 4601726 (Dec. Sept. 23, 2019).  Now following discovery, Freedom Forum moves for summary judgment on Baker-Notter's remaining claims for sex discrimination and pay discrimination under Title VII, the Equal Pay Act (EPA), and the D.C. Human Rights Act (DCHRA).  *See* Def. Freedom Forum's Mot. Summ. J. ("Def.'s Mot."), ECF No. 46.  The motion is fully briefed and ripe for resolution.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 48; Def. Freedom Forum's Reply Mem. Further Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No 50.  For the following reasons, the Court will grant the motion with respect to the pay discrimination claims, but allow Baker-Notter's sex discrimination claims to proceed.

## II.  BACKGROUND[1]

Baker-Notter began working at Freedom Forum, a non-profit organization that operated the "Newseum," in 1989 as a Grants Assistant.  Def.'s Statement Undisputed Material Facts ("SUMF") ¶¶ 1, 12, ECF No. 46-3.  During her first tenure at the organization, which lasted until 2001, she received several promotions, becoming an Operations Coordinator, Visitor Service Manager, and Senior Operations Manager.  *Id.* ¶¶ 12–15.  She left the Freedom Forum in 2001 as part of a buyout offered to several employees when the Newseum closed its facility in Arlington, Virginia, but returned a few years later as the Senior Manager of Staffing and Training.  *Id.* ¶¶ 18–20.  Baker-Notter claims that prior to her return, the Vice President of Operations Jim Thompson told her that she would be promoted to Director of Operations in the near future, but that she could not be rehired into that position directly because it would be unfair to other Operations Department employees who had never left the Freedom Forum.  Deposition of Donna Baker-Notter ("Baker-Notter Dep. Tr.") at 93:3–19, Ex. B of Def.'s Mot., ECF No. 46-5 & Ex. 1 of Pl.'s Opp'n, ECF No. 48-2.

---

[1] As required by Local Civil Rule 7(h)(1), Freedom Forum has included a statement of undisputed material facts with its motion and Baker-Notter has responded to that statement by either contesting or conceding each paragraph.  Freedom Forum argues that this Court should treat thirty-one of those facts as conceded because Baker-Notter "simply denies or states a fact is not material without any supporting record citations or explanation," Def.'s Reply at 4–5, rather than providing "references to the parts of the record relied on" for each disputed fact as required by the Rule, *see* L. Civ. R. 7(h)(1).  The purpose of the rule is to require "the parties and their counsel, who are most familiar with the litigation and the record, to crystalize for the district court the material facts and relevant portions of the record."  *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 65-66 (D.D.C. 2015) (quoting *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996).  Overall, the Court is satisfied that Baker-Notter's explanations—albeit light on citations—adequately illuminate the points of dispute between the parties.  It therefore exercises its discretion to not treat those facts as conceded despite technical non-compliance with the Local Rules.  *See Stafford v. George Washington Univ.*, No. 18-cv-2789, 2022 WL 35627, at *1 n.1 (D.D.C. Jan. 4, 2022) (noting that a party's failure to comply with Rule 7(h) "made it more difficult . . . to assess the summary judgment record" but nonetheless exercising discretion to not treat the assertions as conceded).

At the time of Baker-Notter's return to Freedom Forum, Staffing and Training was one of three sub-departments in the Department of Operations that all reported to Thompson.  SUMF ¶ 23.  The other two sub-departments were Visitor Services and Security, which were headed by Senior Managers Matthew Borowsky and Nathaniel Tucker, respectively.  *Id.*  The Facilities department, which was headed by Cory Leckey, was later moved into the Operations Department in 2008.  *Id.* ¶¶ 28, 39.  In 2010, Baker-Notter and the heads of the other three sub-departments in the Department of Operations were all promoted to the level of Director.  *Id.* ¶ 29.  Baker-Notter earned more than either Borowsky or Tucker at the time of her return to Freedom Forum and throughout the remainder of her time there.  SUMF ¶¶ 75, 78; *see also* Pl.'s Resp. Def.'s Statement Undisputed Material Facts ("SUMF Resp.") at 9, ECF No. 48-18 (conceding that she was paid more than Borowsky or Tucker); Decl. of Cindy Keith, Ex. A of Def.'s Mot. ("Keith Decl.") ¶¶ 26–28, ECF No. 46-4.  Although Leckey earned more than Baker-Notter throughout the time they both worked in the Operations Department, he had been hired and his initial salary had been set by his previous supervisor.  SUMF ¶¶ 42, 79; Keith Decl. ¶¶ 19–20, 29.

Baker-Notter describes what she refers to as a "'good old boy' culture in the Operations department" that she alleges hindered her career development at Freedom Forum.  *See* Am. Compl. ¶¶ 69–81, ECF No. 12.  For example, she and at least one other employee testified that Thompson regularly attended lunch and happy hours and socialized with male employees both during and outside of work hours, including Borowsky, Tucker, and Leckey.  *See* Baker-Notter Dep. Tr. at 140:15–141:2; *id.* at 209:4–210:15; *see also* Dep. Tr. of Matt Leifer at 32:21–33:3, Ex. 13 of Pl.'s Opp'n ("Leifer Dep. Tr."), ECF No. 48-14 ("[M]y perception was often that [Borowsky] benefitted from going to lunch every day with [Thompson], and . . . was protected in a way from getting additional tasks or work").  And the other Freedom Forum employee testified

that Thompson and other males engaged in the inappropriate behavior of zooming in on women on the security cameras and making objectifying comments about their physical appearance. Leifer Dep. Tr. at 26:7–28:22.

Baker-Notter also testified that she was asked to assist with administrative tasks and assigned projects to support the other three male directors, but that the male directors were not asked to take on similar duties.  Baker-Notter Dep. Tr. at 106:18–22 (describing how Thompson asked her to cover the phones when his secretary was out of the office); *id.* at 307:6–9 (testifying that Thompson would ask Baker-Notter to "prepare his board meeting information . . .  rather than asking his assistant to do it"); Decl. Donna Baker-Notter ¶ 10, Ex. 12 of Pl.'s Opp'n ("Baker-Notter Decl."), ECF No. 49-1.[2]  She also testified that she was asked to take responsibility for housekeeping services because "as a female" she had "a better eye."  Baker-Notter Dep. Tr. at 298:4–7.  Baker-Notter also testified that when she brought concerns about demeaning or rude behavior from her fellow directors to Thompson's attention, he would tell her that she was being too "emotional" or to "be nice"—comments that she alleges were not made to the male directors.  Baker-Notter Dep. Tr. at 99:8–100:13.

In 2015, Baker-Notter was promoted to Senior Director of Operations and received a $10,000 mid-year raise.  SUMF ¶ 30.  The parties disagree on the circumstances surrounding this promotion.  According to Freedom Forum, Thompson "created" the position in order to justify a mid-year raise, but the position did not actually give her additional authority over the other directors in the Operations Department.  *Id.* ¶¶ 33–35.  In contrast, Baker-Notter claims that the promotion was to lay the foundation for her to succeed Thompson after his retirement and that

---

[2] This exhibit was not attached to Baker-Notter's Opposition and was filed separately as an *errata.*

she was asked to take on additional responsibilities such as the Operations budget.  SUMF Resp.

at 3–4 (contesting SUMF ¶¶ 33–35).  Baker-Notter testified that despite this understanding,

Thompson told her after she had received the promotion that "he was going to hold off on me

supervising the guys right away because they were going to be upset that I had been promoted."

Baker-Notter Dep. Tr. at 142:1–4.

 Prior to that promotion, Baker-Notter testified that she had prepared a survey of salaries

of people with similar titles in other organizations in the D.C. area in response to Thompson's

request and perception that Operations was the "lowest paid group" in the company.  Baker-

Notter Dep. Tr. at 130:1–131:22.  She alleges in the Amended Complaint that the survey

demonstrated that "she was being grossly underpaid by more than $40,000," Am. Compl. ¶ 100,

but acknowledges that the survey looked only at employees with similar titles in other

organizations—not other employees at Freedom Forum, SUMF ¶ 77.[3]

There is no dispute that Baker-Notter was an outstanding employee over the course of

more than two decades that she spent with Freedom Forum.  *See* Answer ¶ 135, ECF No. 21

("Defendant admits that Plaintiff received positive performance appraisals."); Exs. 2–10 of Pl.'s

Opp'n, ECF Nos. 48-3–11 (Baker-Notter's annual performance appraisals from her second

tenure at Freedom Forum, which describe her performance in glowing terms with words such as

"exceptional," "tireless," "flawless[]," and "superior").  Indeed, following her termination,

Thompson provided Baker-Notter with a letter of recommendation in which he stated that she

was a "natural leader with strong organizational skill and the ability to motivate people" and that

---

[3] Neither party has chosen to rely on that survey by submitting it into evidence.  *See* Def.'s Reply at 14 (noting its absence in the record).

it had been his "hope and belief that she would replace [him] a[s] Senior Vice President of Operations" upon his retirement.  Ex. 15 of Pl.'s Opp'n, ECF No. 48-16.

Nonetheless, Baker-Notter's employment with the Freedom Forum was terminated during an organization-wide reduction in force in January 2017.  SUMF ¶ 10.  None of the other directors from the Operations Department were terminated at this time.  Dep. Tr. of James Thompson at 34:8–14, Ex. C of Def.'s Mot. ("Thompson Dep. Tr."), ECF No. 46-6 & Ex. 16 of Pl.'s Opp'n, ECF No. 48-17.  Freedom Forum characterizes the decision to let Baker-Notter go as an unfortunate but necessary consequence of the need to drastically reduce the Operations budget.  SUMF ¶ 101.  It states that Thompson determined that Baker-Notter's sub-department could be dissolved, and its responsibilities redistributed, with minimal impact on daily operations or the visitor experience, and that her relatively high salary made her a logical choice for the reduction.  *Id.* ¶¶ 100–05.  Baker-Notter disputes this, describing the purported elimination of her department as a "shell game" because some of the staff on her team were kept on following the reduction in force and moved under the other departments.  Baker-Notter Decl. ¶¶ 2–3, 9.

### III.  LEGAL STANDARD

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard serves to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, then the non-movant must point to specific facts in the record that reveal a genuine issue

that is suitable for trial. *Celotex*, 477 U.S. at 324. A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmovant must provide evidence that would permit a reasonable jury to find in their favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

When evaluating whether a genuine dispute of fact exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). However, a conclusory assertion offered without any evidentiary support does not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable or not significantly probative" evidence will not preclude summary judgment. *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) (quoting *Anderson*, 477 U.S. at 249–50).

## IV. ANALYSIS

### A. Sex Discrimination Claims (Counts II and III)

Claims for unlawful employment discrimination follow the familiar burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, under which the plaintiff employee must first establish a *prima facie* case for discrimination, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action, and the plaintiff bears the final burden of showing that the asserted reason was pretextual. 411 U.S. 792, 802, 804 (1973). DCHRA discrimination claims are analyzed in the same manner. *See Wicks v.*

*Am. Transmission Co. LLC*, 701 F. Supp. 2d 38, 44 (D.D.C. 2010), *aff'd*, No. 10-7055, 2010 WL 4340376 (D.C. Cir. Oct. 1, 2010) ("Discrimination claims brought under the DCHRA are analyzed in the same manner as claims brought under Title VII . . . .").

At the summary judgment stage "[i]n a Title VII disparate-treatment suit where an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, it must determine whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex." *Id.*  "'All of the evidence'" that, taken together, may support a reasonable inference of discrimination includes "'any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.'" *Johnson v. District of Columbia*, 947 F. Supp. 2d 123, 133 (D.D.C. 2013) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

Here, Freedom Forum has provided a legitimate, non-discriminatory reason for Baker-Notter's termination: that Freedom Forum was forced to downsize due to financial difficulties and eliminating Baker-Notter's position and reporting sub-department allowed the museum to reduce costs without significantly impacting the visitor experience.  SUMF ¶¶ 100–04; *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 142 (D.D.C. 2010) ("A planned reduction in force necessitated by business conditions is a legitimate reason for terminating an employee.").

Freedom Forum had been having financial difficulties during the years prior to and following Baker-Notter's termination, as evidenced by multiple rounds of layoffs, Baker-Notter's own statements near the time, and the subsequent closing of the Newseum.  *See* SUMF ¶¶ 4–9 (listing rounds of reductions in force from 2008–2020); *id.* ¶ 122 ("On December 31, 2019, the Newseum ceased operations because of problems with expenses and debt."); Ex. J of Def.'s Mot., ECF No. 46-13 (stating in a 2016 letter by Baker-Notter that "[t]he Newseum is struggling").  Although Baker-Notter disputes the extent to which those financial difficulties actually impacted hiring or raises, *see* SUMF Resp. at 9, it is undisputed that in late 2016 Thompson was told that he would have to reduce expenditures in the Operations Department by $500,000, specifically from salaries.  SUMF ¶¶ 92–93.

According to Thompson's testimony, he decided that "the logical solution was to take the person who offered me the highest salary . . . that I could afford to live without.  And it turned out to be . . . [Baker-Notter] and the department that she ran."  Thompson Dep. Tr. at 335:1–5.  Although Baker-Notter was the only director terminated in January 2017, twenty-six employees were let go across the organization, including ten from the Operations Department.  SUMF ¶¶ 7, 98.  Indeed, Baker-Notter's sub-department was eliminated and her primary tasks, and some of her direct reports, were moved to other departments.  *See id.* ¶¶ 112–18 (describing the uncontested redistribution of responsibilities from Baker-Notter's department); Ex. C of Keith Decl. (organizational chart following the January 2017 reduction in force).  When asked why he chose to terminate Baker-Notter instead of Borowsky, Thompson testified that her higher salary was actually "one of the primary reasons."  Dep. Tr. of James Thompson as Corp.-Designee 129:14–18, Ex. F of Def.'s Mot. ("Thompson Corp. Dep. Tr."), ECF No. 46-9 ("[T]here is a salary difference between those two of about, I don't know, $10,000 or maybe better.  I needed

every penny I could.").  No one else was given the role of Senior Director of Operations after
Baker-Notter's departure.  SUMF ¶ 109.

Baker-Notter argues that there is enough evidence for a reasonable jury to doubt the
sincerity of Freedom Forum's asserted nondiscriminatory reason for her termination.  Pl.'s
Opp'n at 9.  First, Baker-Notter testifies to her own belief that Thompson could not have reached
his $500,000 goal with the layoffs that occurred and describes the reorganization of the
Operations Department as a "shell game" in which at least some of the employees under her
were transferred to other departments rather than let go.[4]  Baker-Notter Decl. ¶¶ 8–9.  But
showing pretext "requires more than simply criticizing the employer's decisionmaking process."
*Hairston v. Vance–Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).  "[A]n employer's action may be
justified by a reasonable belief in the validity of the reason given even though that reason may
turn out to be false."  *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).  Thompson's
strategy may not have been the wisest or most effective choice, but it is not for the Court to
second-guess it here.  "[C]ourts should not evaluate the reasonableness of the employer's
business decisions, such as whether it made financial sense to terminate an employee who
generated substantial revenue; we are not a super-personnel department that reexamines an
entity's business decisions."  *DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016)
(quotations omitted).

---

[4] Baker-Notter also does not point to any record evidence besides her own declaration
that, "[t]o [her] knowledge, the $500K criteria that Thompson spoke about as a benchmark . . .
was still not met."  Baker-Notter Decl. ¶ 8.  A party's conclusory, uncorroborated speculation,
even under oath, cannot suffice on its own to create a genuine dispute of material fact.  *See
Greene*, 164 F.3d at 675 ("Although, as a rule, statements made by the party opposing a motion
for summary judgment must be accepted as true for the purpose of ruling on that motion, some
statements are so conclusory as to come within an exception to that rule."); *Harding v. Gray*, 9
F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere unsubstantiated allegation of superior qualifications
creates no 'genuine issue of fact' and will not withstand summary judgment.").

But Baker-Notter also argues that a reasonable jury could infer pretext from the evidence of the "good old boy" culture in the department, and here her argument has more merit.  Pl.'s Opp'n at 9.  Baker-Notter has collected a fair amount of evidence regarding sexism in the Operations Department, both from her own testimony and that of another employee.  *See, e.g.*, Baker-Notter Dep. Tr. at 99:14–19 ("If I voiced an issue or a concern related to one of the men, a lot of the time it was, You're being over the top.  You're being emotional.  You need to calm down.  Comments like that were not made to the men . . . ."); *id.* at 125:22–126:2 ("I also was not made to feel that it was appropriate for me to necessarily hang out with [Thompson and the male directors]."); *id.* at 202:12–17 ("There was an environment where the guys just got away with whatever they wanted to do and, you know, I was constantly left out of things.  They were having happy hours in the office.  They were keeping Five Buck Chuck in the refrigerator for Jim Thompson so that he would be set for the happy hours."); Leifer Dep. Tr. at 26:7–27:22 (testifying that Thompson and other male employees used the security cameras to zoom in on women and made objectifying comments about their appearances on multiple occasions).

In addition to evidence regarding the general culture in the Operations Department, some of the testimony directly bears on how that culture impacted Thompson's decision-making.  *See, e.g.*, Baker-Notter Dep. Tr. at 99:19–21 ("[Thompson] seemed to care more about what the men thought of him than equitable treatment in a lot of the situations that we were in."); *id.* at 114:19–115:8 (testifying that the decision to "promote three other people rather than promoting [Baker-Notter] into the position [Thompson] told [her she] would have" "was done more out of [Thompson]'s concern for hurting the other guy's feelings than business reasons"); *id.* 142:1–4 ("It wasn't until after the position happened that [Thompson] then said to me he was going to hold off on me supervising the guys right away because they were going to be upset that I had

been promoted."); Leifer Dep. Tr. at 32:13–15 ("Thompson required promotions across the board as opposed to rewarding individual performance.").  A reasonable jury could conclude from this evidence that Thompson's alleged bias was the actual motivation for Baker-Notter's dismissal.[5]

Of course, Freedom Forum disputes those specific allegations and provides contrary testimony that Thompson highly valued Baker-Notter as an employee and in many ways advocated for her.  *See, e.g.*, Thompson Dep. Tr. at 335:5–6 (acknowledging that Baker-Notter "was doing an outstanding job").  And while Thompson's consistency with respect to his criteria for including Baker-Notter in the reduction in force will likely bolster his credibility with the jury, Freedom Forum is incorrect that a consistent explanation for a personnel action can support summary judgment in the face of colorable competing evidence.  *See* Def.'s Mot. at 17; *see also Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 145–146 (D.D.C. 2017), *aff'd*, 746 F. App'x 23 (D.C. Cir. 2018) (noting that "a jury can conclude that an employer's asserted reasons are pretextual when it offers shifting and inconsistent explanations for its action" but finding that the decisionmaker's rationale had in fact remained consistent in that case).  Here, there is some competing evidence from which a jury could infer bias in Thompson's decision-making, and it is up to the jury to make credibility determinations.  *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  The Court will therefore deny summary judgment on the sex discrimination claims and allow Baker-Notter the opportunity to present them to a jury.

---

[5] To be clear, there is no debate that Newseum's economic woes were pretextual or contrived.  *See* Def.'s Mot. at 16 (arguing that "Baker-Notter's inability to identify any evidence that creates a dispute of material fact regarding Freedom Forum's need to complete a RIF is fatal to her sex discrimination claims").  The contested issue is not whether a layoff was necessary, but whether Baker-Notter's inclusion in that layoff was discriminatory.

### B. Pay Discrimination Claims (Counts VI and VII)

The Equal Pay Act of 1963 codifies the principle of "equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). Specifically, the EPA makes it illegal for an employer to pay employees of one sex at a lower rate than employees of another "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The DCHRA protects that same important right under D.C. law. *See* D.C. Code § 2-1402.11(a)(1)(A) (prohibiting discrimination against an employee "with respect to . . . compensation" on the basis of gender identity and sex); *Hawley v. Blackboard, Inc.*, No. 03-cv-656, 2005 WL 513496, at *8 n.1 (D.D.C. Mar. 3, 2005) ("Claims of unequal pay under the DCHRA are governed by the standards of the Equal Pay Act."); *George Washington Univ. v. Violand*, 940 A.2d 965, 979 (D.C. 2008) ("A plaintiff who alleges that she was unlawfully paid less than a man must establish that the employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.").

EPA claims are also governed by a burden-shifting scheme, in which the plaintiff employee bears the initial burden of establishing the *prima facie* elements of a violation of the EPA, and then the burden shifts to the defendant employer to show that difference in pay "is justified under one of the Act's four exceptions." *Corning Glass Works*, 417 U.S. at 196 (1974). A *prima facie* case under the EPA has two core elements: 1) "unequal pay" and 2) "working in a 'substantially similar' (i.e., substantially equal) job." *Savignac v. Day*, 539 F. Supp. 3d 107, 116 (D.D.C. 2021); *but see Nyman v. FDIC*, 967 F. Supp. 1562, 1577 (D.D.C. 1997) (requiring the three elements of "substantially equal work," "similar working conditions," and "a lower wage").

The "equal pay" prong of the *prima facie* case is not seriously in dispute here, as the parties agree that Baker-Notter earned more than two other directors in the Operations department (Borowsky and Tucker) and earned less than one (Leckey).[6]   SUMF ¶ 75.  Nor is the fact that Baker-Notter earned more than Borowsky and Tucker dispositive.  A "plaintiff need not compare herself to all similarly classified male employees, but may choose one or more among those allegedly doing substantially equal work."  *Goodrich v. Int'l Brotherhood of Elec. Workers, AFL-CIO*, 815 F.2d 1519, 1524 (D.C. Cir. 1987); *see also Thompson v. Sawyer*, 678 F.2d 257, 275 (D.C. Cir. 1982) ("Plaintiffs need not show that their jobs were substantially similar to all, or even most bookbinder jobs.").  The main disagreement is over whether Baker-Notter's job was substantially equal to Leckey's.

The standard of "substantial equality" for work is "a middle course between a requirement that the jobs in question be 'exactly alike' and a requirement that they be merely 'comparable.'"  *Thompson*, 678 F.2d at 271.  This is a fact-intensive question that "is not dependent on job classifications or titles" and instead requires careful analysis of "actual job requirements and performance."  29 C.F.R. § 1620.13(e).  As indicated by the statute, "[a] determination of substantial equality involves an inquiry into whether the jobs are substantially related and substantially similar in skill, effort, responsibility and working conditions."  *Goodrich*, 815 F.2d at 1524.  The Department of Labor regulations provide further gloss on those four terms by providing definitions and examples.  "Skill includes consideration of such factors as experience, training, education, and ability," 29 C.F.R. § 1620.15(a), "[e]ffort is concerned with the measurement of the physical or mental exertion needed for the performance of a job,"

---

[6] The Court does not consider whether Baker-Notter's position was at any point "substantially equal" to Borowsky or Tucker's positions because it is undisputed that, at all relevant times, Baker-Notter in fact earned more than both.

*id.* § 1620.16(a), "[r]esponsibility is concerned with the degree of accountability required in the

performance of the job," *id.* § 1620.17(a), and "'similar working conditions' encompasses two

subfactors: 'surroundings' and 'hazards,'" *id.* § 1620.18(a).

The job description for Director of Facilities—Leckey's position—describes the primary

job responsibilities as "[o]versee[ing] the daily operations, maintenance and upkeep of the

Newseum," overseeing contractors for outsourced building services, tracking their hours, and

reviewing their work.  Ex. A of Keith Decl. at 3.  The job description for Baker-Notter's position

as Senior Director of Operations describes her responsibilities as "[o]versee[ing] the daily

operations of the Training and Volunteer Services departments, private tours, public parking,

housekeeping, and shipping and receiving," serving as the ADA compliance officer, preparing

departmental budget forecasts, serving as the point of contact for the parking garage contract,

and filling in for the Senior Vice President of Operations in his absence.  *Id.* at 4.  According to

the organizational chart, there was one direct report under Leckey and five full time contractors

under that person.  Ex. B of Keith Decl.  Under Baker-Notter, there were six individuals who

directly reported to her, three other staff as well as contractors and volunteers who reported to

them, and six parking contractors who directly reported to Baker-Notter as well.  *Id.*

There are indeed some similarities between these roles.  They reported to the same

individual, had similar supervisory responsibilities over other employees and contractors, and

oversaw daily operations at the Newseum—albeit different aspects of those operations.  As this

Court noted in its previous opinion, "[h]igh-level managers working in discrete areas of

organizations will necessarily have different responsibilities from one another, and courts should

not require so much detail about similarity at the front end of a lawsuit as to make equal pay laws

largely inapplicable to this class of employees."  *Baker-Notter*, 2019 WL 4601726, at *9.  But

the Court also cautioned in that opinion that Baker-Notter would "have to show more than just comparability" to prevail at the next stage.  *Id.*  In looking at the evidence submitted at the summary judgment stage, it determines that Baker-Notter has not done so.

With respect to working conditions, both positions worked in the same environment, the Newseum facility, and neither party alleges that Leckey was subject to any physical hazards or risks that made his job meaningfully different.  *See* 29 C.F.R. § 1620.18(a) (defining working conditions).  With respect to effort, "jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs."  29 C.F.R. § 1620.16(a).  The regulations provide an example of a difference in kind, but not amount, of effort: a male supermarket employee who "is required to spend part of his time . . . replacing stock involving the lifting of heavy items" as compared to a female supermarket employee who "is required to devote an equal degree of effort during a similar portion of her time to performing fill-in work requiring greater dexterity—such as rearranging displays."  29 C.F.R. § 1620.16(b).  Any additional physical effort that Leckey expended as a requirement of his job would have been a different *kind* of effort, but it does not follow that it was a greater *amount*.

Still, Freedom Forum raises a valid—and uncontested—point that Leckey's job required him to be on-call 24/7.  *See* Def.'s Mot. at 31; SUMF ¶ 55 ("Leckey was on call 24-7 to respond to any emergency that may arise at the Newseum building."); SUMF Resp. at 1 (not disputing SUMF ¶ 55).  A demand for availability, particularly 24/7 availability, may be a relevant factor that makes a job "unequal."  *See Goodrich*, 815 F.2d at 1525 (determining that union representative's requirement of "being visible and available" to serve as "resource persons" even when not carrying out a particular task at union events made two positions unequal); *Usery v. St. John Valley Sec. Home*, No. 75-21-ND, 1976 WL 545, at *6 (D. Me. Apr. 1, 1976), *aff'd sub*

*nom. Marshall v. St. John Valley Sec. Home*, 560 F.2d 12 (1st Cir. 1977) (the position of ambulance attendant was different even though those duties were performed only a small percentage of the time because the job required them to be "on call" to perform those tasks).

Baker-Notter's principal obstacle, however, is that these two positions had vastly different content with respect to skills and responsibilities. Leckey's job required skilled technical knowledge, such as how to repair high-voltage light fixtures and electrical panels, maintain the building's HVAC system, and inspect the fire alarms and fire suppression systems.[7] SUMF ¶¶ 57–60. Baker-Notter's testimony describes skills that she possessed and Leckey allegedly did not, *see, e.g.*, Baker-Notter Dep. Tr. at 307:10–20 (describing how Baker-Notter prepared a report that should have been assigned to Facilities because "[Leckey] was not very computer literate"), but the fact remains that those skills were different ones. The same is true of the content of their responsibilities, which contained markedly different day-to-day tasks. As Baker-Notter testified, she and Leckey "had very different work" because, in her words, Baker-Notter was the "brains" and Leckey the "brawn" of the department. Baker-Notter Dep. Tr. at 262:21–263:1.

The case Baker-Notter relies on, *Hawley v. Blackboard*, is not to the contrary. *See* Pl.'s Opp'n at 16. In that case, the plaintiff and the alleged comparators were all salespersons, and the disputed issues of fact involved the necessity of travel to the position, the similarities of the product and the market for their sales, and the extent to which the size of their teams impacted

---

[7] The Court need not consider Freedom Forum's arguments that Leckey's high wage was justified by his unique knowledge of the building stemming from his involvement in the construction phase, as that argument is most properly understood as an affirmative defense. In determining whether two jobs are substantially equal for purposes of the *prima facie* case, courts should consider "only the skills actually required by those jobs, not the abilities of the persons currently in those positions." *Goodrich*, 815 F.2d at 1524.

their managerial duties.  *Hawley v. Blackboard, Inc.*, 2005 WL 513496, at *12.  Those disputes

of fact about what the plaintiff and the comparators actually did were enough to preclude

summary judgment.  *Id.* at 13.  Here, however, there is no similar debate over the actual content

of Leckey and Baker-Notter's jobs.

Rather, the thrust of Baker-Notter's arguments is not that she and Leckey had

"substantially equal" jobs, but that she had a *more* demanding and skilled job.  *See* Pl.'s Opp'n at

17 (arguing that Baker-Notter's range of abilities and supervisory responsibilities "made her role

more akin to the male employees in *Goodrich II*" whose work merited higher pay).  There is

evidence for that argument in the record.  *See* Baker-Notter Dep. Tr. at 306–08 (giving multiple

examples of work performed by Baker-Notter outside of her area of primary responsibility);

Leifer Dep. Tr. at 88:6–7 (describing Baker-Notter as "one of the more versatile directors in the

department"); Ex. 3 of Pl.'s Opp'n at 1 (stating in Baker-Notter's 2008–2009 evaluation that

"[a]lthough her primary responsibility is Staffing and Training, her efforts during the past year

have played a vital role in the overall success currently enjoyed by the entire Operations

Department"); Ex. A of Keith Decl. at 3–4 (copies of the job descriptions for both positions).

Unfortunately, such an argument falls outside the scope of what a court can remedy under

the Equal Pay Act.  The Supreme Court has declined to endorse the theory of "comparable

worth" in EPA cases, "under which plaintiffs might claim increased compensation on the basis

of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same

organization or community."  *Washington Cnty. v. Gunther*, 452 U.S. 161, 166 (1981).  "In

adopting the 'equal pay for equal work' formula, Congress carefully considered and ultimately

rejected the 'equal pay for comparable worth' standard" which "would involve both

governmental agencies and courts in the impossible task of ascertaining the worth of comparable

work, an area in which they have little expertise." *Id.* at 184 (Rehnquist, J., dissenting and emphasizing the narrowness of the holding).  Unlike the fairly narrow task of determining whether two jobs are "substantially equal," determining "how far the salaries for . . . two [unequal] jobs 'should' differ strains the competence of the litigation process."  *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007).

In sum, there is evidence from each side that either of these two jobs may have warranted higher pay for different reasons, such as the "on-call" nature of Leckey's position and the highly technical skill set it required, or the greater supervisory nature of Baker-Notter's position and her versatility within the department.  But none of that changes the fact that these two positions were simply very different.  It is the burden of a plaintiff in an EPA claim to identify a comparator of the opposite sex performing "substantially equal" work, and Baker-Notter has not done so here. Accordingly, the Court will grant summary judgment to Freedom Forum on the pay discrimination claims.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 15, 2022                                    RUDOLPH CONTRERAS
                                                          United States District Judge